FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 13 2009

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

1 09-cv-0400

-GET

|  |  |
|---|---|
| KENT SEWRIGHT, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) ) Civil Action No.: _____ |
| Plaintiff, | ) ) |
| v. | ) ) |
| ING GROEP N.V., ING NORTH AMERICA INSURANCE CORPORATION, ING LIFE INSURANCE AND ANNUITY COMPANY,  DAVID A. WHEAT, DARRYL HARRIS,  MICHEL J. TILMANT,  JOHN C.R. HELE, ING U.S. PENSION COMMITTEE and JOHN DOES 1-20, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE
## RETIREMENT INCOME SECURITY ACT ("ERISA")

## INTRODUCTION

1.      Plaintiff Kent Sewright ("Plaintiff") brings this lawsuit as a class action on behalf of himself and on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the ING Americas Savings Plan and ESOP and the ING 401(k) Plan for ILIAC Agents (collectively, the "Plans").

2.      This class action is filed pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

3.      Plaintiff seeks damages caused by Defendants under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  Under § 502(a)(3) of ERISA, 29 U.S.C. § l132(a)(3), Plaintiff also seeks equitable relief from Defendants, including the imposition of a constructive trust, injunctive relief, restitution, and other monetary relief.

4.      Throughout the Class Period (June 1, 2007 to the present), the Plans invested heavily in the stock of ING Groep N.V. and in the ING Leveraged Stock Fund and ING Market Stock Fund, which funds' assets were comprised almost exclusively of ING stock.  As the Company admitted in the Plans' Annual Statement filed on June 26, 2008:  "At December 31, 2007 and 2006, the Plan's assets were significantly concentrated in ING mutual funds and shares of ING Groep N.V. (the 'Company," a Netherlands corporation which is the parent of the Plan Sponsor) stock."

5.      The Plans' fiduciaries knew or should have known that during the Class Period, ING had made a series of material misrepresentations and omissions regarding the Company's results,

loans, assets, and mortgage-related securities, and that the Company's revenues and growth potential would be significantly negatively impacted.

6.     Moreover, during the Class Period, ING and the Defendants made numerous and repeated statements to Class Members assuring them that ING was doing well and was well-positioned to withstand any market turmoil.

7.     The Plans' fiduciaries knew or should have known that the above material misrepresentations and omissions made ING highly susceptible to huge financial losses and caused ING common stock to trade at artificially-inflated levels during the Class Period.

8.     Beginning on October 17, 2008, ING began to announce that declining asset prices would affect ING's Q3 '08 results. ING further admitted for the first time that the deterioration in its condition would force it to raise additional capital. ING's financial condition  has since collapsed to the point where it had to be bailed out by the Dutch government in the form of a 10 billion euro capital infusion.

9.     On January 13, 2009, ING announced that it was laying off 750 employees in the United States – 7% of its U.S. workforce. In addition to the layoffs, the Company announced that about 170 vacant positions would not be filled.

10.     On January 26, 2009, ING announced that "in light of the extraordinary developments over the past few months" Michel Tilmant was stepping down as CEO and stepping down from the Company's Executive Board.   Jan Hommen was named to replace him.  The news media noted that: "Tilmant leaves his position as the company continues to struggle.  The firm would

not only lose its CEO it has also lost nearly 7,000 ING employees. This comes all on top of a fourth quarter deficit of nearly 3 billion Euros."

11. Amidst ING's financial collapse during the Class Period, the value of ING common stock has plummeted in value, a loss that has significantly reduced the overall value of the Plans' assets and Participants' vested retirement benefits.

12. Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period as required by ERISA. Defendants breached their fiduciary duties owed to the Plans and the Participants under ERISA by, among other things:

- Selecting and maintaining ING common stock as an investment alternative under the Plans and permitting the Plans to buy and hold shares of ING common stock during the Class Period when it was an imprudent investment;

- Encouraging ING's employees to invest in the ING common stock;

- Failing to divest the Plans from shares of ING common stock when continuing to do so became imprudent as a result of the Company's misrepresentations and omissions, as discussed herein;

- Abdicating their continuing duty to review, evaluate and monitor the suitability of the Plans' investment in ING common stock; and

- Failing to provide accurate, material information to Participants about, among other things, ING's susceptibility to financial losses due to a weakening economy and declines in the quality of its assets and the Company's need to raise significant additional capital.

13. As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial losses, resulting in the depletion of hundreds of

-4-

millions of dollars of the retirement savings and anticipated retirement income of the Plans' Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from their fiduciary breaches.

14. Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plans during the Class Period. Plaintiff also brings this action as a Participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

15. In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are, by necessity, upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

16. This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

17.   ERISA provides for nationwide service of process.   ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All the Defendants are either residents of the United States or engaged in conduct in Atlanta, Georgia which caused the harm alleged herein, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P.  4(k)(I)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the Northern District of Georgia.

18.   Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district in Atlanta, Georgia, the Plans' annual reports on Form 11-K were audited by Ernst & Young in Atlanta, Georgia, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

19.   In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

20.   Plaintiff Kent Sewright is a former ING employee and is a participant in the Plans. During the Class Period, Plaintiff's assets held in his Plan account were heavily concentrated in ING stock.

21.   Defendant ING Groep N.V. is a global financial services provider headquartered in Amsterdam, The Netherlands.  It has operations in Europe, the United States, Canada, Latin

America, Australia and Asia. Its common shares trade on the Euronext exchange, while its American Depository Shares and bonds trade on the New York Stock Exchange ("NYSE"), which is an efficient market. Its ADS shares trade under the ticker "ING."

22.    Defendant ING Life Insurance and Annuity Company ("ILAC") is the Sponsor of the ING 401(k) Plan for ILIAC Agents.

23.    Defendant ING North America Insurance Corporation is the Sponsor of the ING Americas Savings Plan and ESOP.

24.    Defendant David A. Wheat is the Chairman of the ING U.S. Pension Committee. Defendant Wheat signed the June 26, 2008 Form 11-K Annual Statements for the Plans on behalf of the ING U.S. Pension Committee.   Defendant Wheat also signed the Form 5500 as the individual signing as the Plan Administrator.

25.    Defendant Darryl Harris was the Chairman of the ING U.S. Pension Committee in 2006 and 2007. Defendant Harris signed the Form 11-K Annual Statement for the Plans filed on June 18, 2007 on behalf of the ING U.S. Pension Committee.   Defendant Harris also signed the Form 5500 as the individual signing as the Plan Administrator.

26.    Defendant Michel J. Tilmant ("Tilmant") was a member of the Executive Board of ING from 1998 to May 2000, Vice-Chairman from May 2000 to April 2004 and Chairman of the Executive Board of the Company from April 2004 until January 26, 2009, when it was announced he was stepping down from such positions.

27.    Defendant John C.R. Hele ("Hele") is Chief Financial Officer ("CFO") of the Company and has served as a member of the Executive Board of ING since 2007. Defendant Hele will be leaving the Company effective March 31, 2009.

28.    Defendant ING U.S. Pension Committee ("Pension Administration Committee") is charged with administering the Plans. The Pension Administration Committee consisted of various officers and employees of ING, who managed the operation and administration of the Plans.

29.    Because Plaintiff is currently unaware of the true identities and capacities of the remaining members of the Pension Administration Committee, those individuals are collectively named as John Does 1-10. Plaintiff will substitute the real names of the John Does 1-10 when they are known to Plaintiff.

30.    Upon information and belief, there were also other individuals at ING who acted as named or de facto fiduciaries of the Plans. Because Plaintiff is currently unaware of the true identities and capacities of such individuals, those individuals are collectively named as John Does 11-20. Plaintiff will substitute the real names of John Does 11-20 when they are known to Plaintiff.

## CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plans
> at any time from June 1, 2007 through and including the present,
> and whose Plan accounts included investment in ING stock or who
> were participants in the ING ESOP.

32.    Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the

Class because:

33.    *Numerosity.* The members of the Class are so numerous that joinder of all members

is impracticable. While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, Plaintiff believes there are, at

minimum, tens of thousands of members of the Class who participated in, or were beneficiaries

of, the Plans during the Class Period.

34.    *Commonality.* Common questions of law and fact exist as to all members of the

Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

(a)    Whether Defendants acted as fiduciaries;

(b)    Whether Defendants breached their fiduciary duties to the Plans,

Plaintiff and members of the Class by failing to act prudently and solely in the

interests of the Plans, and the Plans' Participants and beneficiaries;

(c)    Whether Defendants violated ERISA;

(d)    Whether the Plans suffered a loss and, by extension, members of

the Class sustained a diminution in vested benefits, and

(e)     What is the proper measure of loss to the Plans and subsequent allocation of vested benefits to the Plans' Participants.

35.     *Typicality.* Plaintiff's claims are typical of the claims of the members of the Class because the Plan, the Plaintiff, and the other members of the Class each sustained a diminution in vested benefits arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

36.     *Adequacy.* Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, securities, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

38.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate

-10-

over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### THE PLANS

39.    The Plans are "employee pension benefit plans" within the meaning §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(3) and 1002(2)(A).

40.    The Plans are "defined contribution plans" or "individual account plans" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

41.    The Plans are broad-based, tax-qualified savings plans (or 401(k) plans), providing for employee and employer contributions.

42.    Under the Plans, regular full-time and certain part-time employees of ING can make elective contributions to the Plan immediately after their date of hire and are eligible to receive Company contributions on the first 6% of eligible contributions.

43.    Plan participants may save from 1% to 50% of their eligible before-tax earnings.   In addition, ING matches 100% of participants' first 6% of eligible contributions.  The Plans also state that ING may, at its discretion, make a profit sharing contribution to the Plans.  However, the Summary Plan Description for the Plans states that ING does not currently make profit sharing contributions.

44.    A Plan participant may elect to invest contributions in any combination of investment funds and to change investment elections for future contributions on any business day that the NYSE is open.  The investment funds available under the Plan include (1) various mutual funds;

and (2) the ING Market Stock Fund and ING Leveraged Stock Fund, which are invested in ADS shares of ING stock.

45.    As the Company admitted in the Plans' Annual Statement filed on June 26, 2008: "At December 31, 2007 and 2006, the Plan's assets were significantly concentrated in ING mutual funds and shares of ING Groep N.V. (the 'Company," a Netherlands corporation which is the parent of the Plan Sponsor) stock."

46.    ING National Trust served as the Trustee and Recordkeeper for the Plans during the Class Period.

## DEFNDANTS' FIDUCIARY STATUS

**Plan Fiduciaries**

47.    *Named Fiduciaries.* ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(l), 29 U.S.C. § l002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary and, in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

48.    *De Facto Fiduciaries.* ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan,

-12-

or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(2l)(A)(i).

49.     Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and their Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

50.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans – and the Plans' investments – solely in the interest of the Plans' Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

51.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.   Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

**Fiduciary Status of ING and the Plan Sponsors**

52.     As Plan Sponsors, Defendants ING Groep, N.V., ING Life Insurance and Annuity Company ("ILAC"), and ING North America Insurance Corporation are  named fiduciaries of the Plans pursuant to ERISA § 402(a)(l), 29 U.S.C. § 1002(2l)(A).  The Plan Sponsors had the

responsibility of establishing investment options or alternatives in the Plans and reserved the right to change any investment alternatives, including the right to eliminate investment funds. Thus, this responsibility also included the duty of monitoring the performance of the investment funds, including ING common stock in the Plans. These are fiduciary functions under ERISA, pursuant to Department of Labor regulations. 29 C.F.R. § 2509.75-8 (D-4).

53. The Plan Sponsors, at all applicable times, exercised control over the activities of ING's directors, officers, and employees, including control over their activities related to the Plans. Through the Board or otherwise, ING and the Plan Sponsors had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, ING and the Plan Sponsors had the authority and discretion to appoint, monitor, and remove individual directors, officers, and employees from their individual fiduciary roles with respect to the Plans. Accordingly, the actions of the Pension Administration Committee Defendants are imputed to ING and the Plan Sponsors under principles of agency and the doctrine of *respondeat superior,* and ING and the Plan Sponsors are liable for such actions.

54. The Plan Sponsors also had the fiduciary duty to appoint and, hence, had a duty to monitor and remove the Trustee, and to execute the Trust documents with the Trustee to provide for the investment, management, and control of the Plans' assets.

55. The Plan Sponsors also acted as a fiduciary in connection with the dissemination of Plan communications made to the Plans' Participants. The Plan Sponsors made direct representations to the Plans' Participants relating specifically to the Plans' investment options, ING's business and financial condition, and the merits of investing the Plans' assets in ING

common stock, and those representations were intended to communicate to Participants information necessary for them to manage their savings accounts under the Plans.

56.     Upon information and belief, the Plan Sponsors were responsible for disseminating a Summary Plan Description ("SPD") for the Plans to Participants.  Upon information and belief, the Plan Sponsors were also responsible for disseminating to Participants the Plans' Prospectus ("Prospectus"), which purported to describe the investment characteristics of the Plans' various investment options.   The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plans' assets allocated to their accounts.

57.     Upon information and belief, ING's filings with the SEC, including, but not limited to, annual reports, press releases, Forms 6-K, Forms 20-F, and Registration Statements, were part of the SPD and the Prospectus.  The Plan Sponsors exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate information to Plan Participants necessary for Participants to manage their savings accounts under the Plans.

58.     Under ERISA, the Plan Sponsors were not required to cause the Plans to offer ING common stock as an investment option under the Plans or to incorporate all of ING's SEC filings into the Plans' documents but, once they elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

**Fiduciary Status of the Pension Administration Committee**

59.     As the designated Administrator for both Plans, the ING U.S. Pension Committee (the "Pension Administration Committee") was a named fiduciary of the Plans under ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). Defendants Wheat and Harris and the other members of the Pension Administration Committee exercised discretionary authority or discretionary control respecting the management of the Plans, the administration of the Plans, and/or the management or disposition of the Plans' assets.

60.     Upon information and belief, the Pension Administration Committee and its members exercised discretionary authority and responsibility for selecting, evaluating, monitoring, and altering the makeup of the investment alternatives provided under the Plans.

61.     The Pension Administration Committee exercised discretionary authority or control in selecting, evaluating, monitoring, and altering the makeup of the investment alternatives available under the Plans. The Committee also had the discretionary authority or control to appoint investment managers to make investment decisions for the Plans.

62.     Upon information and belief, the Pension Administration Committee Defendants also had the responsibility to provide complete and accurate information to Participants about the investment offerings in the Plans, either directly or by communicating that information to the Board.

## ING'S MISREPRESENTATIONS AND OMISSIONS

63.     During the Class Period, ING made false statements in prospectuses issued in connection with the sale of 6.375% ING Perpetual Hybrid Capital Securities ("6.375% Securities") and/or the 8.50% ING Perpetual Hybrid Capital Securities ("8.50% Securities")

(collectively, the "Securities") of ING Groep N.V. ("ING" or the "Company"). The Company filed false registration statements and two prospectuses (collectively, the "Registration Statement") in connection with the Company's June 2007 and June 2008 offerings of the Securities, respectively the "Offerings".

64.     Defendants also made statements to Plaintiff and the Class during the Class Period to the effect that ING was well capitalized, did not need additional capital, did not suffer from the problems afflicting other financial companies at the time, was positioned to withstand deteriorating economic conditions, and continued to recommend that Plan participants invest some of their retirement savings in ING stock.

65.     Defendants consummated the Offerings pursuant to the false and misleading Registration Statement and Prospectuses. Specifically, ING sold 41,800,000 6.375% Securities at $25 per share for proceeds of over $1 billion in the June 2007 Offering and 80 million 8.50% Securities at $25 per share for proceeds of approximately $2.0 billion (including the over allotment) in the June 2008 Offering. The Registration Statement/Prospectuses incorporated ING's financial results for 2005/2006 and 2006/2007.

66.     After the Offerings, ING announced €2 billion in impairment charges associated with its exposure to bad loans, mortgage-related securities and other "pressurized" assets, causing the prices of the Securities issued in the Offerings, as well as the price of its common stock, to significantly decline.

67.     The true facts which were omitted from the Registration Statement and other statements made by Defendants during the Class Period were:

- Defendants' assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

- Defendants failed to properly record losses for impaired assets;

- The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; and

- ING was not as well capitalized as represented and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the Dutch government.

68.    On or about December 1, 2005, ING filed with the SEC a Form F-3ASR Registration Statement.   The Securities were to be issued by ING.   The Form F-3ASR incorporated by reference subsequently filed prospectuses:

> [F]or the purpose of determining liability under the Securities Act of 1933 to any purchaser:
>
> *       *       *
>
> (ii) Each prospectus required to be filed pursuant to Rule 424(b)(2), (b)(5) or (b)(7) as part of a registration statement in reliance on Rule 430B relating to an offering made pursuant to Rule 415(a)(1)(i), (vii) or (x) for the purpose of providing the information required by Section 10(a) of the Securities Act of 1933 shall be deemed to be part of and included in the registration statement as of the earlier of the date such form of prospectus is first used after effectiveness or the date of the first contract of sale of securities in the offering described in the prospectus. As provided in Rule 430B, for liability purposes of the issuer and any person that is at that date an underwriter, such date shall be deemed to be a new effective date of the registration statement relating to the securities in the registration statement to which the prospectus relates, and the offering of such securities at that time shall be deemed to be the initial bona fide

offering thereof; provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such effective date.

69.    On or about June 8, 2007, ING filed, pursuant to Rule 424(b)(5) of the 1933 Act, its

Prospectus for the June 2007 Offering, which formed part of the Registration Statement (the

"June 2007 Prospectus"). The June 2007 Prospectus reported, as of March 31, 2007, ING

shareholder equity of €40.117 billion.

70.    The June 2007 Prospectus also stated:

We have filed a registration statement on Form F-3 under the Securities Act of 1933, as amended, with the SEC covering the Securities. For further information on the Securities, you should review our registration statement and its exhibits.

*       *       *

We incorporate by reference the documents listed below, which we filed with or furnished to the SEC:

• Our Annual Report on Form 20-F for the year ended December 31, 2006, filed on April 20, 2007; [and]

*       *

• Our Current Report on Form 6-K filed on June 4, 2007.

71.    The Form 20-F ING filed with the SEC on April 20, 2007, and which was

incorporated by reference into the Registration Statement, stated:

[O]ur financial position – thanks to focused portfolio management over the past three years – enables us to allocate our capital across businesses and client segments in such a way that it optimizes the highest growth and return.

-19-

\*       \*       \*

We believe ING's financial results demonstrate that our underlying performance in all business lines remains strong. . . .   ING Real Estate experienced another year of strong growth, both in profits and assets under management.

\*       \*       \*

Our residential mortgage portfolio reached EUR 69 billion, and in terms of profit, mortgage business achieved break-even in 2006.

\*       \*       \*

Managing risks

Important progress has been made in 2006 in improving risk modeling and measurement techniques. At Group level, we are developing risk metrics that capture bank and insurance risk into a single view. We significantly improved the quantification and our understanding of the credit risk in our banking book in line with Basel II, and on the insurance side, we have introduced a market consistent framework which enables more accurate pricing of complex products.

ING strengthened the risk management organisation and centralised the risk function by means of creating the position of (deputy) Chief Risk Officer (CRO) who is responsible for managing and controlling risk on a consolidated level. These improvements further enhance the full integration of risk management in our daily business activities and strategic planning . . . .

72.    The Form 20-F also reported ING's financial performance for 2006.  Among other things, it reported total annual income of $62.378 billion and net annual profit of $8.949 billion.

73.    The Form 6-K ING filed with the SEC on June 4, 2007, and which was incorporated by reference into the Registration Statement, reported ING's condensed consolidated interim accounts for the three month period ended March 31, 2007.  It reported, *inter alia*, total income of €18.516 billion and net profit (before minority interests) of €1.958 billion.

74.    On June 13, 2007, defendants sold at least 41,800,000 6.375% Securities to the public at $25 per share pursuant to the Registration Statement.

75.    On April 2, 2008, Defendant Michel Tilmant gave a presentation to analysts and investors in Amsterdam at the ING Group Investor Relations Symposium. His presentation was entitled "Focused for Growth" and stated that: (a) ING was well positioned to capitalize on changes in its industry; (b) ING was one of the most well-capitalized and well-funded financial institutions in the world; and (c) that ING was well positioned for both short-term and long-term growth in revenues and profits as a result of its focus on banking, investments, life insurance and retirement services.

76.    On April 2, 2008, ING's CFO, Defendant John Hele, gave a presentation to analysts and investors in Amsterdam at the ING Group Investor Relations Symposium. His presentation was entitled "Measuring Performance" and stated that ING was developing four Key Performance Indicators (KPIs) to better track its results. ING disclosed statistics for the KPIs for 2006 and 2007 at the symposium and stated that KPIs would be presented on a quarterly basis in the analyst presentation beginning in Q1 '08. The fourth KPI was Required Capital, and Hele represented that ING was in good condition with respect to Required Capital, which overall had declined by 6% from FY '06 to FY '07.

77.    On or about June 12, 2008, ING filed, pursuant to Rule 424(b)(5) of the 1933 Act, its Prospectus for the June 2008 Offering, which formed part of the Registration Statement (the "June 2008 Prospectus"). The June 2008 Prospectus reported, as of March 31, 2008, ING shareholder equity of €539 million.

78.   The June 2008 Prospectus also stated:

We have filed a registration statement on Form F-3 under the Securities Act of 1933, as amended, with the SEC covering the Securities. For further information on the Securities, you should review our registration statement and its exhibits.

*      *      *

We incorporate by reference the documents listed below, which we filed with or furnished to the SEC:

*      *      *

• Our Current Report on Form 6-K filed on May 15, 2008 (our consolidated condensed interim accounts for the three-month period ended March 31, 2008); [and]

*      *      *

• Our Annual Report on Form 20-F for the year ended December 31, 2007, filed on March 19, 2008.

79.   The Form 20-F ING filed with the SEC on March 19, 2008, and which was incorporated by reference into the Registration Statement, stated:

In a very challenging environment in 2007, ING performed strongly, both on the commercial front and in the areas of risk management and capital allocation.

*      *      *

ING has weathered the turmoil in credit markets with limited direct impact. All in all, we believe that our performance in 2007 demonstrates that the fundamentals underpinning our business are sound.

80.   The Form 20-F also reported ING's financial performance for 2007. Among other things, it reported total annual income of $117.707 billion and net annual profit of $14.202 billion.

81.    The Form 6-K ING filed with the SEC on May 15, 2008, and which was incorporated by reference into the Registration Statement, reported ING's condensed consolidated interim accounts for the three month period ended March 31, 2008. It reported, *inter alia*, total income of €19.998 billion and net profit (before minority interests) of €1.564 billion.

82.    On June 17, 2008, defendants sold at least 80 million 8.50% Securities to the public at $25.00 per share pursuant to the Registration Statement. The Company's stock closed at $35.56 on the NYSE that day.

83.    The Registration Statement and Prospectuses contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and were not prepared in accordance with applicable SEC rules and regulations.

84.    The true facts which were omitted from the Registration Statement were:

- Defendants' assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

- Defendants failed to properly record losses for impaired assets;

- The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; and

- ING was not as well capitalized as represented, and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the Dutch government.

85.    By September 19, 2008, the Company's stock had started to decline and closed at $30 on the NYSE.  The Company continued to take steps to assure the market that ING was well capitalized and well positioned to withstand the market turmoil affecting other financial companies.    That same day, John Hele, ING's CFO, made a presentation to investors and analysts in Madrid, Spain at "ING Investor Day."   Hele's presentation was entitled "ING Is Managing Through the Current Market Turmoil."   In his presentation, Mr. Hele made the following statements:

(a) ING is carefully managing through the current market turmoil;

(b) ING has prudent capital management, including the fact that ING targets a AA rating on its investments and maintains spare leverage on its own balance sheet;

(c) ING has carefully selected its investments after a thorough credit analysis;

(d) ING has a diversified investment portfolio;

(e) ING is carefully managing its risk exposure in the current economic environment, including:

1.   Carefully managing its counterparty risks;

2.   Maintaining a diversified, well-collateralized retail loan book;

3.   ING is taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy.

86.   At the September 19, 2008 ING Investor Day in Madrid, Hele specifically represented that *ING "is more than adequately capitalized."*

87.   At the September 19, 2008 ING Investor Day in Madrid, Hele specifically represented that ING was not only "more than adequately capitalized," but that ING had *spare leverage of €3.9 billion and that all of the spare leverage was "already on ING's balance sheet."*

88.   At the September 19, 2008 ING Investor Day in Madrid, Hele specifically stressed the fact that *ING's capital management tools allowed ING to handle any capital needs that might arise in the future without resorting to outside sources of capital.* As to the internal sources that Hele specifically emphasized were capable of ensuring adequate capital, Hele mentioned ING's strong earnings, the ability to engage in acquisitions and/or divestitures, risk reduction measures being undertaken at ING, the fact that ING's capital was fungible and could be moved around internally between ING's insurance, banking, and other operations in order to maintain required key capital ratios.  Hele also stressed the fact that ING Group and ING Insurance currently hold significant cash, which is available for injection into the banking, insurance, and subsidiary operations, which "would effectively increase the D/E-ratios to the current limits." He also stressed the fact that ING's debt to equity ratio could be increased up to 15% in order to increase any capital required in the future.

89.   These comments lead the stock market and Plan Participants to believe that ING was adequately capitalized and well-positioned to withstand the market turmoil affecting other

financial companies, and that ING did not suffer the significant problems affecting these other companies, including the need to raise significant amounts of new capital.

90.    Less than one month after Hele made these comments, on October 17, 2008, ING issued a press release entitled "ING's capital position in line with targets despite market turmoil in third quarter," which stated in part:

> Turmoil in financial markets and declining asset prices inevitably impacted ING's results in the third quarter, with impairments on equity and bond investments, pressurised asset classes, losses attributable to financial counterparties and fair value changes on real estate totaling approximately EUR 1.6 billion before tax. Loan loss provisioning at the bank also increased to approximately EUR 400 million. That is expected to result in a net loss of approximately EUR 500 million in the third quarter, based on preliminary numbers.
>
> . . . ING's Alt-A, subprime and CDO investments of approximately EUR 1.5 billion after tax were reflected in shareholders' equity in the third quarter, bringing total shareholders' equity to EUR 23.9 billion at the end of September.

91.    On this news, the price of the Company's common stock declined by 27.6%, closing at $10.65 after reaching an intra-day low of $9.89. The stock had closed the day before at $14.70. The price of the Securities also dropped by over 8%.

92.    On October 19, 2008, ING issued a press release entitled "ING to strengthen core capital by EUR 10 billion," which stated in part:

> ING announced today that it has reached an agreement with the Dutch government to strengthen its capital position, creating a strong buffer to navigate the current market and economic environment. ING will issue non-voting core Tier-1 securities for a total consideration of EUR 10 billion to the Dutch State.
>
> *       *       *
>
> ING Group will use the proceeds of the transaction to increase shareholders' equity in ING Bank by EUR 5 billion and to strengthen the balance sheet of ING Insurance by EUR 2 billion. The remaining EUR 3 billion will be

used to reduce the Debt/Equity ratio at ING Group from 15% to around 10%. After this transaction, ING Bank's core Tier-1 ratio will be around 8%, with ING Bank's Tier-1 ratio above 10%.

93.   On October 20, 2008, ING Senior Management issued a Memorandum to Plan participants entitled "ING Strengthens Core Capital:   Retirement savings and insurance customers continue to benefit from ING's strengthened financial position." In the Memo, ING Senior Management stated that:

> "In today's often confusing and turbulent economic environment, we understand that it's more important than ever for you to feel comfortable about the company that manages your investment.
> "That's one of the reasons why ING has chosen to take part in a program offered by the Dutch government to further strengthen our capital position – our "buffer" against unexpected economic events – by €10 billion.
> "*Our position in terms of capital is strong*. In fact, our capital ratios, which are a key measure of the strength of our company, exceed the requirements set by regulators.
> ". . . We are making this move to give our stakeholders and customers the most confidence and protection we can. *It means your retirement savings or insurance products continue to benefit from ING's strengthened financial position.*"

94.   Also in October 2008, in response to ING's reported €500 million loss, and €10 billion infusion of capital from the Dutch government, ING disseminated a brochure entitled "Answers to Questions You May Have" to Plan Participants. The Brochure stated:

### Answers to Questions You Might Have

**What does the Dutch government investment/participation in ING mean for me?**
This is good news.   You will be dealing with an even stronger financial services organization backed by the government of one of the world's leading economic powers. But what is important to realize is that ING has always had a strong capital position in line with targeted levels in the context of our third-party ratings.   With the measures taken yesterday, ING remains consistent with its prudent and conservative approach to have sufficient financial buffers. For you, it means your ING-affiliated company remains strong.

**Is this investment by the Dutch government connected to the financial performance of ING and its ratings?**
No. ING is confident about the strength of its financial position. Its ratings currently remain strong. After this capital reinforcement we think our position is even stronger.

**Are you in the same situation as Fortis, which was nationalized a few weeks ago, or other competitors?**
You cannot compare our situation to that of other companies – every company is different. We cannot speak for others, but ING has always had a strong position and has continued meeting all its capital requirements. We did not enter into this agreement to repair a gap in our balance sheet.

**How about the €500 million loss you reported? Will you go bankrupt?**
On Friday, October 17, ING reported a preliminary third quarter loss of EUR 500 million. Final third quarter financials will be released on November 12. Given ING's prudent and conservative approach towards risks, this is the first time since the crisis began mid-last year that ING has reported a loss. The reported losses and fluctuation in our share price do not affect the safety of your deposits nor impact the claims paying ability of contracts.

**What caused the drop in your profits in the third quarter?**
Operational performance of the business was solid, given the challenging market environment.

**And isn't ING one of the world's strongest and most prudent banks?**
We are. ING is simply adapting to extraordinary market circumstances where even healthy banks need to take measures to reinforce their position. ING is confident in its financial situation and wants to maintain its high standards as a prudent and conservative financial services institution. We remain very well-funded – we are one of the world's largest financial services institutions – and we have strong credit ratings. We have solid risk management processes, which have helped us weather the current financial turmoil and we are well-diversified as both an insurer and bank.

**Why is the ING stock down?**
All financial stocks are getting badly hit by this unusual and unstable market environment. ING is no different. The fluctuation in ING's stock price does not affect the safety of your ING products (including: deposits, mutual fund operations or the claims-paying ability of annuities and insurance policies).

**Is this transaction related to the drop in the stock price last Friday?**
No – the drop in our share price was of course very unfortunate for our shareholders – but did not trigger our decision to look at options to strengthen our capital position.

**Will the government provide extra capital if you need it?**
We believe this transaction gives ING ample capital to continue to build our franchise in the long term interests of all stakeholders.

**Are my retirement plan investments affected?**
No. The holdings in your plan accounts are protected from creditors of ING. The nature of those protections differs depending on the structure of the investment arrangement. Of course, account values will fluctuate with market conditions and are subject to change.

95.    On October 23, 2008, ING announced that defendant Hele, ING's CFO who made the emphatic statements on September 19, 2008 that ING had no need for any capital infusion, was stepping down effective March 31, 2009.

96.    In response to this disclosure, ING's stock continued to deteriorate. By October 23, 2008, the stock reached an intra-day low of $6.57 and closed at $7.81.

97.    By November 20, 2008, the stock was down to $6.78. The stock is currently trading at $8 per share – a stunning 80% drop from where the stock closed on April 18, 2008 ($40.40). The staggering loss has significantly reduced the overall value of the Plan's assets and Participants' vested retirement benefits.

**Defendants Knew Or Should Have Known That ING
Common Stock Was An Imprudent Investment For The Plan**

98.    At all relevant times, Defendants knew or should have known that the quality of ING's assets was drastically deteriorating and that ING would need to raise significant amounts of new capital, which made ING common stock an imprudent investment for the Plans.

99.    The Defendants had direct knowledge of the problems affecting ING and its need to raise significant additional capital.

100. Yet, Defendants failed properly to take into account the weakening credit environment and deteriorating financial market which put ING common stock at risk, or to properly consider the effect of the above on ING's financial growth and stock value when determining the prudence of investing and holding the Plans' assets in ING common stock.

101. As a result of Defendants' direct knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health and growth potential of ING, any generalized warnings of market and diversification risks that Defendants made to the Plans' Participants regarding the Plans' investment in ING common stock did not effectively inform Participants of the past, immediate, and future dangers of investing in ING common stock.

102. The Pension Administration Committee, responsible for administering the Plans and their assets, either failed to uncover, or uncovered but failed to disclose, the true effect of the deteriorating market and volatility in the financial market on ING's current and future financial health.

103. In addition, the Committee, responsible for selecting the investment options under the Plans, failed to conduct an appropriate investigation into whether ING common stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' Participants with complete and accurate information so that Participants could make informed decisions regarding investing in ING common stock.

104. At the same time, ING and the Pension Administration Committee Defendants failed adequately to review the performance of the other fiduciary Defendants to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.

105. An adequate investigation by the Defendants would have revealed to a reasonable fiduciary that investment by the Plans in ING common stock, under these circumstances where ING was heavily exposed to significantly deteriorating asset values and decreases in its business, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary loss, and would have made different investment decisions. Because Defendants knew or should have known that ING common stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their Participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in ING common stock.

106. Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of all investments in ING common stock; discontinuing all further Participant elective contributions in ING common stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plans; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by ING they could not loyally serve the Plans' Participants in connection with the Plans' acquisition and holding of ING common stock.

107. Despite the availability of these and other options, Defendants failed to take any action to protect Participants from losses as a result of the Plans' investment in ING common stock. In fact, the Defendants continued to invest and allow investment of the Plans' assets in ING common stock even as ING's financial losses came to light.

**Defendants Regularly Communicated with the Plans' Participants
Concerning Investment in ING Common Stock, Yet Failed to
Disclose the Imprudence of Investment in ING Common Stock**

108. Defendants regularly communicated with employees, including the Plans' Participants, about ING's performance, future financial and business prospects, and ING common stock. During the Class Period, the Company fostered a positive attitude toward ING common stock as an investment for the Plans, and/or allowed the Plans' Participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in ING common stock. As such, the Plans' Participants could not appreciate the true risks presented by investments in ING common stock and therefore could not make informed decisions regarding investments in the Plans.

## DUTIES UNDER ERISA

109. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

110. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such

breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

111. ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

112. These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

     (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plans, which invested in ING common stock, to ensure that each investment is a suitable option for the Plans;

     (b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plans' sponsor; and

(c)     A duty to disclose and inform, which encompasses:  (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

113.  ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:  (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

114.  Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## CAUSES OF ACTION

### COUNT I

-34-

## Failure to Prudently and Loyally Manage the Plans' Assets
### (Breach of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

115. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

116. At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

117. As alleged above, the Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plans' investment options, including the option of ING common stock.

118. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plans' assets are responsible for ensuring that investment options made available to Participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants, particularly the Pension Administration Committee, were responsible for ensuring that all investments in ING common stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

119. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan Participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that

would lead to an imprudent result or that would harm plan Participants or beneficiaries, nor may it allow others, including those whom they direct or whom are directed by the plan, including plan trustees, to do so.

120.    The Defendants breached their duties to manage the Plans and its assets prudently and loyally. During the Class Period these Defendants knew or should have known that as a result of ING's investment in assets that were subject to significant devaluation, and due to worsening prospects for the company because of a drastically deteriorating economy and financial market, ING common stock was not a suitable and appropriate investment for the Plans as described herein. Defendants Tilmant and Hele had particular responsibility for reviewing the statements issued by ING.

121.    Investment in ING common stock during the Class Period clearly did not serve the Plans' purposes of helping Participants save for retirement, and in fact caused significant losses/depreciation to Participants' savings.   Nevertheless, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plans and, indirectly, the Plans' Participants and beneficiaries, from suffering losses as a result of the Plans' investment in ING common stock. Further, given that such a high concentration of the assets of the Plans was invested in the stock of a single company – ING – Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

122.    Moreover, the Defendants breached their co-fiduciary obligations by, among their other failures:  knowingly participating in, or knowingly undertaking to conceal, the failure to

prudently and loyally manage the Plans' assets with respect to offering ING common stock as an investment option in the Plans; providing the Company matching contributions in ING common stock, despite knowing that such failure was a breach; enabling the Defendants' failure to prudently manage the Plans' assets with respect to the Plans' investments, including the match as a result of their own fiduciary breaches; and, having knowledge of the failure to prudently manage the Plans' assets, yet not making any effort to remedy the breach.

123. Despite the knowledge that Defendants had or should have, Defendants participated in each other's failures to manage the Plans' assets prudently and knowingly concealed such failures by not informing Participants that the Plans' holdings of ING common stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plans' investment in ING common stock, despite inarguably having knowledge of such breaches.

124. Furthermore, through their own failure to prudently and loyally manage the Plans' investment in ING common stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to manage the Plans' investment in ING common stock prudently and loyally.

125. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and, indirectly, Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in

this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate
### Information to Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

126. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

128. As alleged above, the scope of the Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plans and assets of the Plans. In addition, the Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plans.

129. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plans' assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plans. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that Participants can make informed decisions with regard to investment options available under the

Plan. This duty applies to all of the Plans' investment options, including investment in ING common stock.

130. Because a substantial percentage of the Plans' assets was invested in ING common stock, and Defendants chose to invest overwhelmingly in ING common stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to ING common stock.

131. Specifically, ING, through its officers and directors, issued a multitude of false and misleading statements through SEC filings, direct communications to Plan participants, statements to analysts and investors at ING investor conferences in Amsterdam and Madrid regarding the financial health and growth potential of ING and the value of ING common stock. Defendants further made material omissions in these communications by failing to disclose any information regarding ING's need to raise significant additional capital and the negative effects of the weakening market on ING's results for 2007-2008 and on the value of ING common stock.

132. Upon information and belief, such communications were disseminated directly to all Participants, including the Prospectuses which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by ING, through its officers and directors. In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in ING common stock in company-wide and uniform communications, and yet, in the context of such communications,

failed to provide complete and accurate information regarding ING common stock as required by ERISA.

133. In addition, the Pension Administration Committee was responsible for providing Participants in the Plans with investment education and communication. These Defendants, however, failed to disclose any information to Plan Participants regarding the full extent of the deteriorating economy and how it adversely affected ING common stock as a prudent investment option under the Plans. The Pension Administration Committee defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plans.

134. The Defendants named in this Count breached their duty to inform Participants by failing to provide complete and accurate information regarding ING common stock, making material misrepresentations about the Company's financial condition, and, generally by conveying inaccurate information regarding the soundness of ING common stock and the prudence of investing retirement contributions in the Company's stock.

135. These failures were particularly devastating to the Plans and the Participants, as a significant percentage of the Plans' assets were invested in ING common stock during the Class Period and thus the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

136. In addition, ING and the other Defendants named in this Count knew or should have known that information they possessed regarding the true condition of ING would have a

material impact on the Plans. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

137. As a consequence of the failure of the Defendants named in this Count to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in ING common stock or to appreciate that, under the circumstances known to the fiduciaries but not known by Participants, ING common stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.

138. During the Class Period, ING common stock dropped approximately 80% in value. Had accurate information been provided to Plan Participants, Participants could have protected themselves against losses accordingly, and, consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

139. As a consequence of the Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If these Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans and, indirectly, Plaintiff and the other Class members, lost millions of dollars of retirement savings.

140. Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### Failure to Monitor Appointed Plan Fiduciaries
### and Provide Them with Accurate Information
### (Breach of Fiduciary Duties in Violation of ERISA § 404 Against Defendants ING, Wheat, Harris, Hele, Tilmant, and the ING U.S. Pension Committee)

141. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142. At all relevant times, as alleged above, ING and the other Defendants named in this Count were fiduciaries within the meaning of ERISA § 3(2l)(A), 29 U.S.C. § l002(2l)(A). At all relevant times, as alleged above, the scope of the fiduciary responsibilities of ING and the other Defendants named in this Count included the responsibility to appoint, evaluate, and monitor other fiduciaries. The duty to monitor entails both giving information to, and reviewing the actions of, the monitored fiduciaries.

143. The Defendants maintained discretionary authority and control with respect to appointing the members of the Committee, who has the authority of the Board with respect to the Plans. Accordingly, the Defendants breached their duties to monitor and inform by:

      (a)    Failing to ensure that the Committee, as a monitored fiduciary, had access to knowledge about the Company's operations, financial results, and the

status of ING's credit business, as alleged above, which made ING common stock an imprudent retirement investment;

(b) Failing to ensure that the Committee appreciated the increased risk posed by the significant investment by rank and file employees in ING common stock; and

(c) Failing to disclose to the Committee accurate information about the operations and financial results of ING that the Director Defendants reasonably should have known the monitored fiduciary needed to make sufficiently informed decisions about what investment options the Plan should continue to offer.

144. At the same time, the Committee maintained discretionary authority and control with respect to appointing members of the Committee to manage the operation and administration of the Plan and its assets. Accordingly, the Committee defendants breached their duties to monitor and inform by:

(a) Failing to ensure that the Committee, as a monitored fiduciary, had access to knowledge about the Company's operations, financial results, and the status of ING's credit business, as alleged above, which made ING common stock an imprudent retirement investment;

(b) Failing to ensure that the Committee appreciated the increased risk posed by the significant investment by rank and file employees in ING common stock; and

(c)     Failing to disclose to the Committee accurate information about the operations and financial results of ING that the Committee reasonably should have known the monitored fiduciary needed to make sufficiently informed decisions about what investment options the Plans should continue to offer.

145.  At the same time, the Committee also maintained discretionary authority and control with respect to appointing investment managers to make investment decisions for the Plans. Accordingly, the Committee breached their duties to monitor and inform by:

(a)     Failing to ensure that the investment managers, as monitored fiduciaries, had access to knowledge about the Company's operations, financial results, and the status of ING's eroding capital, as alleged above, which made ING common stock an imprudent retirement investment;

(b)     Failing to ensure that the investment managers appreciated the increased risk posed by the significant investment by rank and file employees in ING common stock; and

(c)     Failing to disclose to the investment managers accurate information about the operations and financial results of ING that the Committee reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plans should continue to offer.

146. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and, indirectly, the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

147. ING and the other Defendants named in this Count are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches, as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

148. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and, indirectly the Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

149. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 405 by All Defendants)

150. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

151. At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

152.   ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

153.   Defendants breached their duty of loyalty by:

(a)     Failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in ING common stock;

(b)     Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made ING common stock an unsuitable investment for the Plans;

(C)     Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(D)     With respect to each of the failures listed in the preceding subparagraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from discovering the Company's financial and operational weaknesses; and

(E)     By otherwise placing the interests of ING and themselves above the interests of the Participants with respect to the Plans' investment in ING common stock by, among other things, keeping the Plans' assets heavily invested in ING common stock when it was imprudent to do so rather than divesting the Plans' investments in ING common stock.

154. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and, indirectly, the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

155. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT V**

**Co-Fiduciary Liability**
**(Breaches of Fiduciary Duties in Violation of ERISA § 405**
**by ING and Defendants Hele and Tilmant)**

156. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157. ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

158. As alleged herein, ING, through its officers and employees, the Pension Administration Committee, and Defendants Hele and Tilmant, withheld material information

-47-

from the Plans' Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, ING and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding return-to-vendor money practices. Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of ING common stock as an investment for the Participants' retirement assets.

159. Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plans' investment and holding of ING common stock during the Class Period. They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in ING common stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one another's failures to prudently and loyally manage the Plans' investment in ING common stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

160. In further violation of ERISA § 405(a)(l)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of a weakening economy and ING's deteriorating asset quality and

need for additional capital and concealing the effect thereof on ING's prospects for 2007-2008 from Participants and the market as a whole.

161. In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants – including any appointed Plan fiduciaries – who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in ING common stock. In so doing, these Defendants breached ERISA § 405(a)(l)(B).

162. Further, through their failure to properly and effectively monitor their appointees on the Pension Administration Committee, as well as appointed investment managers, and remove those fiduciaries whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed Plan fiduciaries' imprudent management of the ING common stock in the Plans.

163. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and, indirectly, Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their retirement investment.

164. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

### Knowing Participation in a Breach of Fiduciary Duty
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 502(a)(3) by ING)

165. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

166. To the extent that ING is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, ING knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

167. ING benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing ING common stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of ING providing the market with materially misleading statements and omissions. Accordingly, ING may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of ING common stock which would have been contributed to the Plan, but for ING's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

168. The Plans suffered millions of dollars in losses in plan benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in ING common stock during the Class Period, in breach of Defendants' fiduciary duties. These losses to the Plans were reflected in the diminished account balances of the Plans' Participants.

169. Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in ING common stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete, and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in ING common stock, and Defendants remain liable under ERISA for losses caused by such investment.

170. Defendants are also responsible for all losses in Plan benefits caused by the investment of the Plans' company contributions in ING common stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

171. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in ING common stock, eliminating such company stock as an investment alternative when it

became imprudent, and divesting the Plans from their holdings of ING common stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that it suffered.

172. Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

173. The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in ING common stock during the Class Period. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

174. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

175. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative

investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

176. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

177. Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

<u>**ERISA SECTION 404(c) DEFENSE INAPPLICABLE**</u>

178. ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions. In order for section 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

179. Those provisions were not complied with here, as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, the Defendants did exactly the opposite. As a consequence, Participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in ING common stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

180. Specifically, Defendants failed to disclose to Participants that ING, through its officers and directors, was subject to significant deterioration in its asset quality, that it was exposed to the same problems affecting other financial companies (and thus was not well-positioned to withstand the economic turbulence), that it would need to raise significant additional capital, and such problems and exposure would prevent ING from meeting its 2008 earnings guidance. By omitting this information from SEC filings and other communications to Participants, Defendants misrepresented the Company's true financial condition and the true value of shares in company stock as a Plan investment. Without being given this information, Plan Participants did not have any informed control over decisions to invest in ING common stock under the Plans.

181. Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff, and the Class for relief stemming from Participants' decisions to invest contributions in ING common stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

182.  Furthermore, under ERISA, fiduciaries – not Participants -- exercise control over the selection of investment options made available to Participants.  Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and, as a result of such action, the Plans suffers a loss.  Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for:

A.    An Order certifying this action as a class action pursuant to Fed.R.Civ.P.23;

B.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

C.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

D.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring Defendants to discontinue Participant contributions to the ING Market Stock Fund and ING Leveraged Stock Fund, and to transfer existing balances in such funds to alternative investment options under the Plans;

F.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

G.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

H.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

I.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.


Dated: February 13, 2009                    **PAGE PERRY LLC**


                                            By: _____
                                                DAVID J. WORLEY
                                                Ga. Bar No. 776665
                                                JAMES M. EVANGELISTA
                                                Ga. Bar No. 707807

1040 Crown Pointe Parkway, Suite 1050
Atlanta, Georgia  30338
Telephone:   (770) 673-0047
Facsimile:   (770) 673-0120

**JOHNSON BOTTINI, LLP**
FRANK J. JOHNSON
FRANCIS A. BOTTINI, JR.
655 West Broadway, Suite 1400
San Diego, California  92101
Telephone:   (619)230-0063
Facsimile:   (619) 233-5535

***Attorneys for Plaintiff and the Class***