**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE ING GROEP, N.V. ERISA LITIGATION | ) MASTER FILE NO. ) 09-cv-00400-JEC ) |
| THIS DOCUMENT RELATES TO: All Actions | ) ) ) ) |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF**
**THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974**

Plaintiffs Kent Sewright and Deadre D. Diggs (collectively, "Plaintiffs") allege the following based upon: (a) personal information as to allegations concerning themselves and their investments in the ING 401k plans; and (b) the investigation of Plaintiffs' counsel as to all other allegations, which investigation included a review of U.S. Securities and Exchange Commission ("SEC") filings by ING Groep, N.V. ("ING" or the "Company"), including the Company's annual reports (Form 20-F), current reports (Form 6-K), and the annual reports (Form 11-K) filed on behalf of the ING Americas Savings Plan and ESOP ("ING Savings Plan") and ING 401(k) Plan for ILIAC Agents ("ILIAC Plan") (collectively, the "Plans"); a review of the Form 5500s filed by the Plans with the U.S. Department of Labor ("DOL"); interviews with participants of the Plans; and a review of available documents governing the operations of the Plans.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a class action brought on behalf of the Plans and all participants and beneficiaries of the Plans, pursuant to § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), against the fiduciaries of the Plans for violations of ERISA.

2.     The Plans are retirement plans sponsored by ING North America Insurance Corporation ("ING North America") and ING Life Insurance and Annuity Company ("ILIAC").

3.     ING North America and ILIAC are principal subsidiaries of ING.

4.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to

exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the period June 1, 2007 through the present (the "Class Period").

5.      Defendants allowed the imprudent investment of the Plans' assets in ING stock[1] ("ING Stock" or "Company Stock") throughout the Class Period, even though they knew or should have known by virtue of their senior positions at the Company that such investment was an unduly risky and imprudent means of saving for retirement because, among other things, the Company was not sufficiently well-capitalized and did not have adequate risk policies and risk management to protect ING from the serious and material problems that were plaguing it.

6.      Beginning on October 17, 2008, the Company began to announce that declining asset prices would affect its Third Quarter 2008 results.  The Company further admitted for the first time that the deterioration in its condition would force it to raise additional capital.  The Company's financial condition has since collapsed to the point where it had to be bailed out by the Dutch government in the form of a 10 billion euro capital infusion.

7.      On January 13, 2009, the Company announced that it was laying off 750 employees in the United States – 7% of its U.S. workforce.  In addition to the layoffs, the Company announced that about 170 vacant positions would not be filled.

8.      On January 26, 2009, the Company announced that "in light of the extraordinary developments over the past few months" Michel J. Tilmant ("Tilmant") was stepping down as Chief Executive Officer ("CEO") and stepping down from the Company's Executive Board. Jan H.M. Hommen ("Hommen") was named to replace him.  The news media noted that: "Tilmant leaves his position as the company continues to struggle.  The firm would not only lose

---

[1] ING stock means ordinary shares (in the form of American Depositary Receipts ("ADRs")) listed on the New York Stock Exchange ("NYSE").

its CEO it has also lost nearly 7,000 ING employees.  This comes all on top of a fourth quarter deficit of nearly 3 billion Euros."

9.      Amidst the Company's financial collapse during the Class Period, the value of the Company's Stock has plummeted in value, a loss that has significantly reduced the overall value of the Plans' assets and participants' vested benefits.

10.      During the Class Period, Defendants with responsibility for the Plans' investments imprudently permitted the Plans to hold and acquire hundreds of millions of dollars in ING Stock despite the Company's serious mismanagement and improper business practices. Based on publicly available information for the Plans, Defendants' breaches have caused tens of millions of dollars of losses to the retirement savings in the Plans.

11.      This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition to money damages, Plaintiffs seek equitable relief from Defendants, including, without limitation, injunctive relief and constructive trust, restitution, and equitable tracing (as available under applicable law).

12.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of all participants and beneficiaries of the Plans whose plan accounts were invested in ING Stock during the Class Period.

13.      In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief.  At such time as Plaintiffs have

had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint or, if required, will seek leave to amend to add additional facts that further support Plaintiffs' claims.

## II.    JURISDICTION AND VENUE

14.    ***Subject Matter Jurisdiction***.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

15.    ***Personal Jurisdiction***.  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, this Court has personal jurisdiction over them.  This Court also has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Georgia.

16.    ***Venue***.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district in Atlanta, Georgia, the Plans' annual reports on Form 11-K were audited by Ernst & Young in Atlanta, Georgia, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## III.    PARTIES

### A.    Plaintiffs

17.    ***Plaintiff Kent Sewright*** is a resident of Des Moines, Iowa.  He previously worked for ING.  He is a participant in the ING Savings Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held ING Stock in the ING Savings Plan during the Class Period.

18.   **Plaintiff Deadre D. Diggs** is a resident of Fulton County, Georgia.   She previously worked for ING.  She is a participant in the ING Savings Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held ING Stock in the ING Savings Plan during the Class Period.

**B.     Defendants**

**ING**

19.   **ING Groep, N.V.** was established as a Naamloze Vennootschap (public limited liability company) on March 4, 1991, through the merger of Nationale-Nederlanden, which was the largest insurer in the Netherlands, and NMB Postbank Group, which was one of the largest banks in the Netherlands.  ING is a global financial institution of Dutch origin offering banking, investments, life insurance, and retirement services.  ING serves more than 85 million private, corporate, and institutional customers in Europe, North and Latin America, Asia, and Australia. ING is incorporated under the laws of the Netherlands.

20.   ING's responsibilities to the Plans were discharged by its governing bodies, the Executive Board and Supervisory Board.  ING, through the Executive Board and the Supervisory Board, exercised control over the activities of its employees who performed fiduciary functions with respect to the Plans.  On information and belief, ING can hire or appoint, terminate, and replace such employees at will.  ING is therefore responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

**ING Executive Board Defendants**

21.   **Defendant Michel J. Tilmant** was a member of the Executive Board of ING from 1998 to May 2000, Vice-Chairman from May 2000 to April 2004, and Chairman of the Executive Board of the Company from April 2004 until January 26, 2009, when it was

announced he was stepping down from such positions.   During the Class Period, Defendant Tilmant was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plans and he exercised authority or control with respect to the management of the Plans' assets.

22.     **Defendant Jan H.M. Hommen** is the former Chairman of the Supervisory Board and the current Chairman of the Executive Board.   On January 26, 2009, the Supervisory Board appointed Defendant Hommen as CEO of ING, and he formally became CEO when appointed as a member of the Executive Board at the Annual General Meeting ("AGM") on April 27, 2009. Since January 26, 2009, Defendant Hommen has been closely involved in the day-to-day operations of ING and worked alongside the Executive Board pending his official appointment as CEO and has also operated in this capacity since his official appointment as CEO.   During the Class Period, Defendant Hommen was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

23.     **Defendant John C.R. Hele ("Hele")** was, at relevant times, the Chief Financial Officer ("CFO") of the Company and has served as a member of the Executive Board of ING since 2007.   Defendant Hele signed the Company's Form S-8, dated March 23, 2009.   Defendant Hele left the Company on March 31, 2009.   During the Class Period, Defendant Hele was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plans and he exercised authority or control with respect to the management of the Plans' assets.

24.     ***Defendant Eric Boyer de la Giroday ("Boyer")*** was, at all relevant times, CEO and a member the Executive Board of ING.  As of January 26, 2009, Defendant Boyer, as a member of the Executive Board, was acting CEO of ING until Defendant Hommen formally took over after the AGM.  During the Class Period, Defendant Boyer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

25.     ***Defendant Dick Harryvan ("Harryvan")*** was, at all relevant times, a member of the Executive Board of ING.  During the Class Period, Defendant Harryvan was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

26.     ***Defendant Tom McInerney ("McInerney")*** was, at all relevant times, a member of the Executive Board of ING.  During the Class Period, Defendant McInerney was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

27.     ***Defendant Hans van der Noordaa ("Noordaa")*** was, at all relevant times, a member Executive Board of ING.  During the Class Period, Defendant Noordaa was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

28.     ***Defendant Koos Timmermans ("Timmermans")*** was, at all relevant times, a member of the Executive Board of ING.  During the Class Period, Defendant Timmermans was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

29.     ***Defendant Jacques de Vaucleroy ("Vaucleroy")*** was, at all relevant times, a member of the Executive Board of ING.  During the Class Period, Defendant Vaucleroy was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

30.     Defendants Tilmant, Hommen, Hele, Boyer, Harryvan, McInerney, Noordaa, Timmermans, and Vaucleroy are hereafter referred to as the "Executive Board Defendants."

31.     The Executive Board's Charter states that the Executive Board is "charged with the management of the Company," including setting ING's objectives, strategy, and policies, as well as the responsibility to ensure ING's compliance with all relevant laws and regulations.

32.     In addition, the Executive Board charter states that "[t]he Executive Board shall on its own initiative provide all information to the Supervisory Board which it may need to function properly and to carry out its duties properly."

33.     ING, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, ING relied and continues to rely directly on the members of its Executive Board to carry out its fiduciary responsibilities with respect to the Plans.  As a result, the Executive Board Defendants are functional fiduciaries under the plans.

**ING Supervisory Board Defendants**

34.     ***Defendant Peter A.F.W. Elverding ("Elverding")*** was, at all relevant times, a member of the Supervisory Board.  Defendant Elverding replaced Defendant Hommen as Chairman of the Supervisory Board after the AGM in April 2009.  During the Class Period, Defendant Elverding was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

35.     ***Defendant Henk Breukink ("Breukink")*** was, at all relevant times, a member of the Supervisory Board.  During the Class Period, Defendant Breukink was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the

Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

36.     ***Defendant Claus Dieter Hoffmann ("Hoffman")*** was, at all relevant times, a member of the Supervisory Board.  During the Class Period, Defendant Hoffman was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

37.     ***Defendant Piet Hoogendoorn ("Hoogendoorn")*** was, at all relevant times, a member of the Supervisory Board.  During the Class Period, Defendant Hoogendoorn was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

38.     ***Defendant Piet C. Klaver ("Klaver")*** was, at all relevant times, a member of the Supervisory Board.  During the Class Period, Defendant Klaver was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the

administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

39.     **_Defendant Wim Kok ("Kok")_** was, at relevant times, a member of the Supervisory Board.  During the Class Period, Defendant Kok was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

40.     **_Defendant Karel Vuursteen ("Vuursteen")_** was, at all relevant times, a member of the Supervisory Board.  During the Class Period, Defendant Vuursteen was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

41.     Defendants Elverding, Breukink, Hoffmann, Hoogendoorn, Klaver, Kok, and Vuursteen are hereafter referred to as the "Supervisory Board Defendants."

42.     ING, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, ING relied and continues to rely directly on the members of its Supervisory Board to carry out its fiduciary responsibilities with respect to the Plans.  As a result, the Supervisory Board Defendants are functional fiduciaries under the plans.

43.     The Supervisory Board's general duties and powers are broad.   However, the charter provides that generally:

> The Supervisory Board shall supervise the policy of the Executive Board and the general course of affairs of the Company and the business connected with it (including its financial policies and corporate structure).   The Supervisory Board shall evaluate periodically the main organisational structure and the operation of the internal risk-management and control systems established under the management of the Executive Board as well as agree on any necessary changes or corrective actions regarding such systems.   The Supervisory Board shall assist the Executive Board with advice.   The Supervisory Board members shall, if necessary or appropriate, adopt an independent stance vis-à-vis the Executive Board and any other particular interests.   The Supervisory Board shall take measures to manage the Company if the Executive Board is unable to perform its duties.

44.     Upon information and belief, the general duties to monitor, alter, assist, and remove policies affecting every aspect of ING – which the charter provides to the Supervisory Committee – extend to and include a duty to monitor, alter or otherwise affect the Plans.

45.     The Supervisory Board delegates many of its duties to various committees of the Supervisory Board.   These include the ING Audit Committee (of which Defendants Breukink and Hoogendoorn are currently members), Renumeration Committee (of which Defendants Elverding, Klaver, and Vuursteen are currently members), Corporate Governance Committee (of which Defendants Elverding, Breukink, and Hoffman are currently members) and the Nomination Committee (of which Defendants Elverding, Klaver, and Vuursteen are currently members).

46.     Upon information and belief, the Executive Board and/or the Supervisory Board delegate tasks that directly affect the Plans to one, many, or all of these committees – including the duty to monitor, appoint, and remove the U.S. Pension Committee members (listed below).

47.     Upon information and belief, the Executive Board and the Supervisory Board have the authority to select the U.S. Pension Committee members.  The Executive Board and Supervisory Board, as a result of their appointment authority bestowed upon them by their respective charters, were required to monitor and provide critical information to their appointees regarding ING and the Plans, and if prudence so dictated, remove the members of the U.S. Pension Committee who failed to faithfully discharge their responsibilities under ERISA.

48.     Thus, the Executive Board Defendants and the Supervisory Board Defendants exercised fiduciary functions under ERISA.

### ING North America Insurance Corporation

49.     *Defendant ING North America Insurance Corporation ("ING North America")* was, at all relevant times, the sponsor of the ING Savings Plan.  Defendant ING North America is a principal subsidiary of ING.  Defendant ING North America is the "Named Fiduciary" of the ING Savings Plan.

50.     *Defendant Kimberly Shattuck ("Shattuck")* was, at all relevant times, a Director of Corporate Benefits at ING North America and a member of the ING U.S. Pension Committee. During the Class Period, Defendant Shattuck was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because she possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because she exercised authority or control with respect to the management of the Plans' assets.

51.     *Defendant Bryon Scott Burton ("Burton")* was, at all relevant times, a Senior Vice President at ING North America.  During the Class Period, Defendant Burton was a

fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because he exercised authority or control with respect to the management of the Plans' assets.

52.     Defendant ING North America has the sole responsibility for the investment and reinvestment of the assets of the ING Savings Plan.  Defendant ING North America may, at any time and at its sole discretion, amend or terminate the ING Savings Plan.

53.     Defendants ING North America, Shattuck, and Burton are herein referred to as the "ING North America Defendants."

### ING Life Insurance and Annuity Company

54.     ***Defendant ILIAC*** was, at all relevant times, the sponsor of the ILIAC Plan.  2008 ILIAC Plan Form 11-K at 4.[2]  ILIAC is a principal subsidiary of ING.

### ING U.S. Retirement Services

55.     ***Defendant Catherine H. Smith ("Smith")*** is the CEO of ING U.S. Retirement Services.   During the Class Period, Defendant Smith was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries and with respect to the management of the Plans, because she possessed discretionary authority or discretionary responsibility in the administration of the Plans, and because she exercised authority or control with respect to the management of the Plans' assets.

56.     ING U.S. Retirement Services is one of the largest defined contribution plans in

---

[2] Pursuant to Section 104(b)(4) of ERISA, Plaintiff Diggs requested that Defendants produce ERISA Plan documents regarding the ILIAC Plan.  As of the date of filing of this amended complaint, Defendants have failed to produce any documents relating to the ILIAC Plan.

the United States with $380 billion in assets under management and administration.   The business serves all segments of the pension market (401(k), 457, 403(b) segments and defined benefit plan administration) as well as individual IRAs in a rollover business.

**The ING U.S. Pension Committee**

57.     ***Defendant ING U.S. Pension Committee (the "Committee")*** was, at all relevant times, the administrator of the Plans.   The Committee is a "Named Fiduciary" of the ING Savings Plan.

58.     The Committee has the sole right to exercise its discretion to construe and interpret the provisions of the ING Saving Plan.   Further, the Committee (as ING Savings Plan Administrator) has the sole right to make rules and regulations necessary or proper for the administration and/or operation of the ING Savings Plan.

59.     The Committee has the power to appoint and remove the trustee for the ING Savings Plan.   Pursuant to the Trust Agreement by ING North America, the Committee, and the ING National Trust (the "Trust Agreement"), the Committee is also responsible for "developing procedures to maintain the confidentiality of any directions received in connection with the Company Stock held as part of the Fund in accordance with Section 404(c) of ERISA and shall be responsible for appointing an independent fiduciary with respect to such directions if required under Section 404(c) of ERISA."   Trust Agreement, Section 3, § 3.2.

60.     Pursuant to the ING Americas Savings Plan and ESOP Amended and Restated Effective as of January 1, 2008 (the "ING Savings Plan Document"), the Committee is bestowed with the following powers:

> **Administration by Committee**.   The Plan will be administered by the Committee, and responsibilities of the Committee under the Plan may also be carried out by on[e] or more delegates.   The Committee may delegate responsibilities under the Plan to

employees of the Participating Employers or to one or more
Administrative Delegates.  The Committee (or to the extent the
Committee has delegated its administrative responsibility under
this Plan, its delegate) shall have the exclusive responsibility and
complete discretionary authority to control the operation,
management and administration of this Plan, with all powers
necessary to enable it properly to carry out such responsibilities,
including (but not limited to) the power to construe this Plan, to
determine eligibility for benefits and to resolve all administrative,
interpretative, operational, equitable and other questions of any
kind or description that arise under this Plan and to settle disputed
claims.  All disbursements shall be made upon, and in accordance
with, the written instructions of the Committee or its delegate.  The
decisions of the Committee (or its delegate) on all matters within
the scope of its authority shall be final and binding upon all
persons.

ING Savings Plan Document, Article XI, § 11.1.

61.    During the Class Period, the Committee was comprised of the following

Company employees:

(a)    **Defendant Darryl Harris ("Harris")** was the Chairman of the ING U.S.

Pension Committee in 2006 and 2007.  Defendant Harris signed the Form 11-Ks, dated

June 18, 2007 for the Plans on behalf of the Committee.  Defendant Harris also signed the

Form 5500 as the individual signing as the Plan Administrator.  During the Class Period,

Defendant Harris was a fiduciary within the meaning of ERISA because he possessed

discretionary authority or discretionary responsibility in the administration of the Plans

and because he exercised authority or control with respect to the management of the

Plans' assets.

(b)    **Defendant David A. Wheat ("Wheat")** was, at all relevant times,

Chairman of the Committee.  Defendant Wheat also signed the Form S-8, dated March

23, 2009 and the 2008 ILIAC Plan Form 11-K.  During the Class Period, Defendant

Wheat was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

17

1002(21)(A), because he possessed discretionary authority or discretionary responsibility in the administration of the Plans and because he exercised authority or control with respect to the management of the Plans' assets.

(c)     ***Defendant Shattuck*** was, as described above, at all relevant times, the Director of Corporate Benefits of ING North America.  Defendant Shattuck signed the Trust Agreement, the 2007 Form 5500 for the ING Savings Plan, and the ING Savings Plan Document.  Defendant Shattuck is also listed as a "Named Fiduciary" in the Trust Agreement.  During the Class Period, Defendant Shattuck was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she possessed discretionary authority or discretionary responsibility in the administration of the Plans and because she exercised authority or control with respect to the management of the Plans' assets.

(d)     ***Defendant William Delahanty ("Delahanty")*** was, at all relevant times, Head of Compensation Benefits and HR Operations.  Defendant Delahanty signed the ING Savings Plan Document.  Upon information and belief, during the Class Period, Defendant Delahanty was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he possessed discretionary authority or discretionary responsibility in the administration of the Plans and because he exercised authority or control with respect to the management of the Plans' assets.

62.     Defendants Harris, Wheat, Shattuck, and Delahanty are herein referred to as the "Committee Defendants."

63.     ***Defendants John Does 1-10.***  Because Plaintiffs are currently unaware of the true identities and capacities of the remaining members of the Committee, those individuals are

collectively named as John Does 1-10.  Plaintiffs will substitute the real names of the John Does 1-10 defendants when they are identified.

## IV.    CLASS ACTION ALLEGATIONS

64.    ***Class Definition***.  Plaintiffs bring this action as a class action pursuant to Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plans at any time between June 1, 2007 through the present and whose accounts included investments in ING Stock.

65.    ***Numerosity***.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe, based on the Plan's Form 5500 for Plan year 2007, that there are over 18,670 participants or beneficiaries in the Plans.

66.    ***Commonality***.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;
- whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;
- whether Defendants violated ERISA; and
- whether the Plans have suffered losses and, if so, the proper measure of damages.

67. ***Typicality***.  Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law, as alleged herein.  In addition, because Plaintiffs assert claims on behalf of the Plans pursuant to ERISA § 502(a), Plaintiffs' claims are necessarily typical – indeed, identical – to the claims of each Class member.

68. ***Adequacy***.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in ERISA class action litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

69. ***Rule 23(b)(1)(B) Requirements***.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

70. ***Other Rule 23(b) Requirements***. Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

# V.   THE PLANS

## A.   The ING Savings Plan

71.   The ING Savings Plan, sponsored by ING North America, is a defined contribution plan.  The ING Savings Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the ING Savings Plan is neither a defendant nor a plaintiff.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the ING Savings Plan and its participants and beneficiaries.

72.   The ING Savings Plan is a voluntary contribution plan whereby participants make contributions to the ING Savings Plan ("Voluntary Contributions") and direct the ING Savings Plan to purchase investments with those contributions from options pre-selected by Defendants, which are then allocated to participants' individual accounts.

73.   The ING Savings Plan was formed on July 1, 2001 when the ING Savings Plan and the ING Incentive Savings Plan for Aetna Financial Services and Aetna International Employees were merged into the Relia Financial Corp. Success Sharing Plan and ESOP.

74.   As of December 31, 2007, ING Savings Plan participants could direct their accounts to be invested in thirteen (13) options (including the ING Leveraged Stock Fund and ING Market Stock Fund) offered by the ING Savings Plan as investment options.

75.   The ING Savings Plan is a retirement plan.  The purposes of the Plans are to provide income to Eligible Employees and to enable them to acquire Company Stock.

76.   In the 2008 ING Savings Plan Form 11-K, the Savings Plan is described as the following:

> The following is a general description of the ING Americas Savings Plan and ESOP, hereinafter referred to as the "Plan."

Participants should refer to the Plan documents, including the Summary Plan Description, for a more complete description of the Plan's provisions, including those described herein.

The Plan is a voluntary defined contribution plan available to all full-time employees, as defined in the Plan document. The Plan is intended to meet the requirements for qualification as both a profit sharing plan and stock bonus plan under the Internal Revenue Code (the "IRC") Section 401(a) with an employee stock ownership feature under Section 4975(e)(7) of the IRC. The employee stock ownership feature of the Plan is designed to invest primarily in qualifying employer securities that meet the requirements of IRC Sections 4975(e)(8) and 409(l). The Plan also contains a salary reduction feature intended to meet the requirements applicable to cash or deferred arrangements under Section 401(k) of the IRC. The Plan is intended to be in full compliance with applicable requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

ING North America Insurance Corporation is the Plan sponsor ("Plan Sponsor", "ING" or the "Company") and the ING U.S. Pension Committee is the Plan administrator ("Plan Administrator"). ING National Trust is the trustee of the Plan.

The Plan covers all eligible employees of ING as well as various other related ING participating employers.

77.     The ING Savings Plan allows employees to save from 1% to 50% of his or her pre-tax eligible earnings (up to limits imposed by the Internal Revenue Service). Under the ING Savings Plan, the Company will match 100% of the first 6% of the participant's eligible contributions. The allocation is made in cash and invested in the same investment options that an ING Savings Plan participant selects for future contributions.

78.     Pursuant to the Company's Savings Plan Prospectus, dated July 31, 2006 ("2006 Prospectus"):

Generally, all employees of participating ING companies are eligible to participate in the Plan immediately upon being hired (ineligible for participation are independent contractors (even if later determined to be a company employee), employees covered by a collective bargaining agreement, leased employees, nonresident aliens with no U.S. source income (except certain designated nonresident aliens paid through the U.S. payroll of a

participating ING company), statutory employees and individuals who are not classified as employees of participating ING companies on the payroll of such companies, (even if they are later reclassified as employees).

79.     As of December 31, 2007, the ING Savings Plan held $178,826,824 of ING Stock.  2008 Savings Plan Form 11-K.  A total of 18,670 persons were participants in or beneficiaries of the ING Savings Plan at the end of December 31, 2007.

80.     The Plan documents do not mandate that the ING Stock Funds[3] invest solely in ING Stock.  Pursuant to the 2006 Prospectus, a portion of the ING Market Stock Fund is held in cash.

81.     Further, pursuant to ING Savings Plan Document, all or part of the Trust Fund may be invested in Company Stock and the Trustee may hold a portion of the Company Stock fund in cash, cash equivalents, or investments other than Company Stock.

82.     Furthermore, the ING Savings Plan does not limit the ability of its fiduciaries, including the Plan administrator, to remove the ING Stock Funds, or divest assets invested in the ING Stock Funds, as prudence dictates.

83.     The ING Savings Plan incorporates by reference the Company's SEC filings.  For example, the Company's 2006 Prospectus states in relevant part:

> ING has filed with the Securities and Exchange Commission a Registration Statement on Form S-8 relating to shares of ING stock and interests to the Plan that have been registered under the Securities Act of 1933.
>
> The following documents have been previously filed with the SEC and have been incorporated by reference into the Registration Statement and this Section 10(a) prospectus as of their respective dates.  These documents are available without charge, upon written request of any plan participants to the plan administrator.

---

[3] The "ING Stock Funds" are the ING Leveraged Stock Fund and ING Market Stock Fund.

1.   The description of ING's Ordinary Shares contained in ING's Registration Statement on Form 8-A on September 28, 2005 (File No. 1-14642);

2.   ING's Annual Report on Form 20-F for the fiscal year ended December 31, 2005;

3.   The plan's Annual Report on Form 11-K for the fiscal year ended December 31, 2005;

4.   ING's Current Reports on Form 6-K filed with the SEC on February 21, 2006, February 21, 2006, March 10, 2006, March 16, 2006, April 27, 2006, May 15, 2006, May 22, 2006, June 6, 2006, and July 6, 2006; and

5.   The description of ING's American Depositary Receipts contained in ING's registration statement on Form F-6 (Registration No. 333-113697), including any amendments or reports filed for purposes of updating such description.

In addition, all documents filed by ING or the plan pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934 subsequent to the date of the Registration Statement on Form S-8 and prior to the filing of a post-effective amendment to the Registration Statement which indicates that all securities offered thereunder have been sold or which deregisters all such securities then remaining unsold shall be deemed to be incorporated by reference into the Registration Statement and this Section 10(a) prospectus and to be part thereof and hereof from the date of the filing of such documents.

Any statement contained herein or in a document incorporated by reference herein or in any other subsequently filed document which also is incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded to constitute a part of this Section 10(a) prospectus.

84.   The Company's Form S-8 also incorporates SEC filings.

**B.   The ILIAC Plan**

85.   The ILIAC Plan is a voluntary defined contribution plan available to all full-time insurance salespersons who have entered into a Career Agent Agreement with ILIAC. The ILIAC Plan is subject to the provisions of ERISA.

86.     The ILIAC Plan is a voluntary contribution plan whereby participants make contributions to the ILIAC Plan and direct the ILIAC Plan to purchase investments with those contributions from options pre-selected by Defendants, which are then allocated to participants' individual accounts.

87.     The Committee is the administrator of the ILIAC Plan.

88.     ING National Trust is the trustee of the ILIAC Plan.

89.     Pursuant to the 2008 ILIAC Plan Form 11-K, the ILIAC Plan assets were invested in the following investment vehicles:

> Blackrock Equity Index Trust, ING Fixed Account, ING Intermediate Bond Fund - Class I, ING International Value Fund-Class I, *ING Market Stock Fund*, ING Real Estate Fund-Class I, ING Solution 2015 Portfolio-Initial Class, ING Solution 2025 Portfolio-Initial Class, ING Solution 2035 Portfolio-Initial Class, ING Solution 2045 Portfolio - Initial Class, ING Solution Income Portfolio - Initial Class, ING VP Index Plus LargeCap Portfolio - Class I, ING VP Index Plus MidCap Portfolio - Class I, ING VP Index Plus SmallCap Portfolio-Class I, ING VP Small Cap Opportunities Portfolio - Initial Class, Mainstay Large Cap Growth Fund, MFS Institutional International Equity Fund, Nuveen NWQ Small/Mid-Cap Value Fund-Class R and Washington Mutual Investors Fund-Class R-5.

(Emphasis added).

90.     ILIAC Plan participants who enter into a Career Agent contract with ILIAC will vest in ILIAC matching contributions over four years of service at the rate of 25% after the first year, 50% after the second year, 75% after the third year, and 100% after the fourth year.  ILIAC Plan participants who entered into a Career Agent contract with ILIAC prior to January 1, 2002 will vest in ILIAC matching contributions over three years of service at a rate of 50% after the first year, 75% after the second year and 100% after the third year.  ILIAC Plan participants are immediately fully vested when any of the following occur: (a) reaching age 65 while actively

employed; (b) dying while actively employed; (c) obtaining eligibility for benefits under ILIAC's managed long term disability plan while actively employed; or (d) termination or partial termination of the Plan.

91.     ILIAC Plan participants may contribute up to 50% of their pre-tax eligible earnings for the ILIAC Plan year.   ILIAC Plan participants may also contribute eligible amounts representing distributions from other qualified plans in a tax-free rollover.

92.     ILIAC matches participants' pre-tax contributions at 60% of each participant's contributions up to the first 6% of total eligible earnings.

## C.     A Significant Portion Of The Plans Assets Were In ING Stock

93.     During the Class Period, a significant amount of the Plans' assets were invested in ING Stock.  As of December 31, 2007, the ING Savings Plan held approximately $178,826,824 of ING Stock.  2008 ING Savings Plan Form 11-K at 13.  Further, as of December 31, 2007, the ILIAC Plan held approximately $3,062,642 of ING Stock.  2008 ILIAC Plan Form 11-K at 10. The value of ING stock declined dramatically during the Class Period following revelations that: (a) the Company had not been carefully managing itself through the current market turmoil; (b) the Company had not had prudent capital management; (c) the Company had not carefully selected its investments after a thorough credit analysis; (d) the Company had not diversified its investment portfolio; (e) the Company had not managed its risk exposure in the current economic environment, including, but not limited to: (i) carefully managing its counterparty risks; (ii) maintaining a diversified, well-collateralized retail loan book; and (iii) taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy.  As of March 5, 2009, ING Stock traded at approximately $3.03 per share, representing a decline of over 93% since the beginning of the

Class Period.  As a result, the Plans incurred substantial losses due to their investment in ING Stock:



94.     Despite the Plans' substantial investment in ING Stock, Defendants failed to protect the Plans and their participants and beneficiaries from the risks that made investment in the Company's stock imprudent.  Defendants continued to cause the Plans to hold ING Stock and compounded the problem (and the losses) by purchasing additional ING Stock during the Class Period.  As a result,  the Plans lost tens of millions of dollars.

## VI.     DEFENDANTS' FIDUCIARY STATUS

**A.     The Nature of Fiduciary Status**

95.     *Named Fiduciaries*.  ERISA requires every plan to have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan document is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

96.     *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  *Id.*

97.     Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and the participants in the manner and to the extent set forth in the Plans' documents, under ERISA, and through his or her conduct.

98.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

99.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

100.    Instead of delegating all fiduciary responsibility for the Plans to external service providers, ING North America and ILIAC chose to delegate their responsibility regarding the administration of the Plans to the Committee.

101.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).  However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plans' sponsor.

**B.    Defendant ING's Fiduciary Status**

102.    On information and belief, in order to comply with ERISA, ING exercised responsibility through the Committee for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA.  *See*, *e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In this regard, the Company and the Committee disseminated the Plans' documents and related materials, which incorporated by reference, among other things, the Company's inaccurate SEC filings, thus converting such materials into fiduciary communications.

103.    On information and belief, the Company exercised control over the activities of its employees (and its subsidiaries) who performed fiduciary functions with respect to the Plans, including the Committee.  The Company, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Thus, the Company is responsible for the activities of its employees (and its subsidiaries) as fiduciaries with respect to the Plans through traditional principles of agency and *respondeat superior* liability.

104.    Finally, under basic tenets of corporate law, the Company is imputed with the knowledge its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to the Company.

105.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Company was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because it exercised discretionary authority or discretionary control over the management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plans.

## C.    Executive Board Defendants' Fiduciary Status

106.    Upon information and belief, ING relied and continues to rely directly on the members of its Executive Board to carry out its fiduciary responsibilities with respect to the Plans.  As a result, the Executive Board Defendants are functional fiduciaries under the Plans.

107.    Consequently, in light of the foregoing duties and responsibilities, the Executive Board Defendants (Tilmant, Hommen, Hele, Boyer, Harryvan, McInerney, Noordaa, Timmermans, and Vaucleroy) were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plans.

**D.      Supervisory Board Defendants' Fiduciary Status**

108.    Upon information and belief, the general duties to monitor, alter, assist and remove policies affecting every aspect of ING, that the charter provides to the Supervisory Committee, extends to a duty to monitor, alter or otherwise affect the Plans.

109.    Consequently, in light of the foregoing duties and responsibilities, the Supervisory Board Defendants (Elverding, Breukink, Hoffmann, Hoogendoorn, Klaver, Kok, and Vuursteen) were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plans.

**E.      Defendant ING North America's Fiduciary Status**

110.    On information and belief, in order to comply with ERISA, ING North America exercised responsibility through the Committee for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA.  *See*, *e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In this regard, ING North America and the Committee disseminated the ING Savings Plan documents and related materials, which incorporated by reference, among other things, the Company's inaccurate SEC filings, thus converting such materials into fiduciary communications.

111.    Defendant ING North America is the "Named Fiduciary" of the ING Savings Plan.

112.    Defendant ING North America is designated as the named fiduciary of the ING Savings Plan "for purposes of Section 402 of ERISA except to the extent other persons are identified as named fiduciaries by the Company or pursuant to ERISA."

113.    On information and belief, ING North America exercised control over the activities of its employees who performed fiduciary functions with respect to the ING Savings Plan, including the Committee.  ING North America, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Thus, ING North America is responsible for the activities of its employees as fiduciaries with respect to the ING Savings Plan through traditional principles of agency and *respondeat superior* liability.

114.    Finally, under basic tenets of corporate law, ING North America is imputed with the knowledge its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to ING North America.

115.    Consequently, in light of the foregoing duties, responsibilities, and actions, ING North America was both a named fiduciary of the ING Savings Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the ING Savings Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because it exercised discretionary authority or discretionary control over the management of the ING Savings Plan, exercised authority or control over the management or disposition of the ING Savings Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the ING Savings Plan.

## F.    Defendant ILIAC's Fiduciary Status

116.    On information and belief, in order to comply with ERISA, ILIAC exercised responsibility through the Committee for communicating with participants regarding the ILIAC

Plan in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA.  *See*, *e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In this regard, ILIAC and the Committee disseminated the ILIAC Plan documents and related materials, which incorporated by reference, among other things, the Company's inaccurate SEC filings, thus converting such materials into fiduciary communications.

117.   ILIAC is the sponsor of the ILIAC Plan.

118.   On information and belief, ILIAC exercised control over the activities of its employees who performed fiduciary functions with respect to the ILIAC Plan, including the Committee.  On information and belief, ILIAC is responsible for the activities of its employees as fiduciaries with respect to the ILIAC Plan through traditional principles of agency and *respondeat superior* liability.

119.   Finally, under basic tenets of corporate law, ILIAC is imputed with the knowledge its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to ILIAC.

120.   Consequently, in light of the foregoing duties, responsibilities, and actions, ILIAC was both a named fiduciary of the ILIAC Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the ILIAC Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because it exercised discretionary authority or discretionary control over the management of the ILIAC Plan, exercised authority or control over the management or disposition of the ILIAC Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the ILIAC Plan.

**G.     ING U.S. Retirement Services**

121.    Upon information and belief, the ING U.S. Retirement Services (and its members, including Defendant Smith) were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plans.

**H.     The Committee Defendants' Fiduciary Status**

122.    The Committee was the administrator for both Plans during the Class Period.

123.    During the Class Period, the Company, ING North America, and ILIAC also relied on the Committee Defendants to carry out their fiduciary responsibilities under the Plans and ERISA.  As a result, the Committee Defendants are both named and functional fiduciaries under ERISA.

124.    The Committee has the power to appoint and remove the trustee for the ING Savings Plan.

125.    The Committee is a "Named Fiduciary" of the ING Savings Plan.

126.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plans.

34

## VII.   FACTS BEARING ON FIDUCIARY BREACH

**A.   Defendants Regularly Communicated To The Market The Purported Strength Of ING Stock**

127.   During the Class Period, ING provided assurances to the market (including participants of the Plans) concerning the strength of the Company and the suitability of investment in ING stock.   In June 2007 and June 2008, the Company filed prospectuses in connection with the sale of 6.375% ING Perpetual Hybrid Capital Securities ("6.375% Securities") and/or the 8.50% ING Perpetual Hybrid Capital Securities ("8.50% Securities") (collectively, the "Securities") of the Company.   The Company filed registration statements and two prospectuses (collectively, the "Registration Statement") in connection with the Company's June 2007 and June 2008 offerings of the Securities, respectively the "Offerings".

128.   Defendants also made statements to Plaintiffs and the Class during the Class Period to the effect that ING was well capitalized, did not need additional capital, did not suffer from the problems afflicting other financial companies at the time, was positioned to withstand deteriorating economic conditions, and continued to recommend that participants of the Plans invest some of their retirement savings in ING stock.

129.   Defendants consummated the Offerings pursuant to the Registration Statement and Prospectuses.   Specifically, ING sold 41,800,000 6.375% Securities at $25 per share for proceeds of over $1 billion in the June 2007 Offering and 80 million 8.50% Securities at $25 per share for proceeds of approximately $2.0 billion (including the over allotment) in the June 2008 Offering.   The Registration Statement/Prospectuses incorporated ING's financial results for 2005/2006 and 2006/2007.

130.   After the Offerings, ING announced €2 billion in impairment charges associated with its exposure to bad loans, mortgage-related securities, and other "pressurized" assets,

causing the prices of the Securities issued in the Offerings, as well as the price of its common stock, to decline significantly.

131.    The Registration Statement and other statements made by Defendants during the Class Period failed to disclose that:

    (1)    Defendants' assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

    (2)    Defendants failed to properly record losses for impaired assets;

    (3)    The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; and

    (4)    ING was not as well capitalized as represented and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the Dutch government.

132.    On or about June 8, 2007, ING filed, pursuant to Rule 424(b)(5) of the 1933 Act, its Prospectus for the June 2007 Offering, which formed part of the Registration Statement (the "June 2007 Prospectus").   The June 2007 Prospectus reported, as of March 31, 2007, ING shareholder equity of €40.117 billion.

133.    The June 2007 Prospectus also stated:

We have filed a registration statement on Form F-3 under the Securities Act of 1933, as amended, with the SEC covering the Securities.   For further information on the Securities, you should review our registration statement and its exhibits.

* * *

We incorporate by reference the documents listed below, which we filed with or furnished to the SEC:

• Our Annual Report on Form 20-F for the year ended December 31, 2006, filed on April 20, 2007; [and]

* * *

• Our Current Report on Form 6-K filed on June 4, 2007.

134.    The Form 20-F ING filed with the SEC on April 20, 2007 was incorporated by reference into the Registration Statement and stated:

> [O]ur financial position – thanks to focused portfolio management over the past three years – enables us to allocate our capital across businesses and client segments in such a way that it optimizes the highest growth and return.
>
> * * *
>
> We believe ING's financial results demonstrate that our underlying performance in all business lines remains strong. . . . ING Real Estate experienced another year of strong growth, both in profits and assets under management.
>
> * * *
>
> Our residential mortgage portfolio reached EUR 69 billion, and in terms of profit, mortgage business achieved break-even in 2006.
>
> * * *
>
> Managing risks
>
> Important progress has been made in 2006 in improving risk modeling and measurement techniques.  At Group level, we are developing risk metrics that capture bank and insurance risk into a single view.  We significantly improved the quantification and our understanding of the credit risk in our banking book in line with Basel II, and on the insurance side, we have introduced a market consistent framework which enables more accurate pricing of complex products.
>
> ING strengthened the risk management organisation and centralised the risk function by means of creating the position of (deputy) Chief Risk Officer (CRO) who is responsible for managing and controlling risk on a consolidated level. These improvements further enhance the full integration of risk management in our daily business activities and strategic planning . . . .

135.    The Form 20-F also reported ING's financial performance for 2006.  Among other things, it reported total annual income of $62.378 billion and net annual profit of $8.949 billion.

136.    The Form 6-K ING filed with the SEC on June 4, 2007 was incorporated by reference into the Registration Statement and reported ING's condensed consolidated interim accounts for the three month period ended March 31, 2007.  It reported, *inter alia*, total income of €18.516 billion and net profit (before minority interests) of €1.958 billion.

137.    On June 13, 2007, ING sold at least 41,800,000 6.375% Securities to the public at $25 per share pursuant to the Registration Statement.

138.    During a November 7, 2007 conference call, Defendant Tilmant made the following representations which led the investment community (which included participants of the Plans) to believe that ING's conservative, risk-averse investment posture protected ING from the adverse impact of the rampant problems in the financial markets:

> ***As I mentioned at the start, our risk policies and our risk management and our strong balance sheet protected ING from the direct impact of market turmoil.  We have been rather conservative in the past, some say prudent in the past, to the point that we got some criticism to be too conservative.  But no, I think this policy is paying off because we have first of all an amount of assets in those assets we require question, which is very limited.***   We have seen negligible impact from the liquidity crisis on the long-term funding cost.  We have experienced no material impairments on the [Euro] 3.1 billion portfolio of investment backed by subprime assets and we have seen no material revaluation of debt securities held in third quarter as credit spreads increased and we were able to also confirm that between the end of the quarter and October 31st we have experienced the same thing.

(Emphasis added).

139.    The foregoing statements were inaccurate because ING was neither conservative nor prudent in its investment decisions.

140.    The Company's Form 20-F filed with the SEC on March 19, 2008 was incorporated by reference into the Plans documents and stated in relevant part:

> In a very challenging environment in 2007, ING performed strongly, both on the commercial front and in the areas of risk management and capital allocation.
>
> * * *
>
> ING has weathered the turmoil in credit markets with limited direct impact.   All in all, we believe that our performance in 2007 demonstrates that the fundamentals underpinning our business are sound.

141.   The Form 20-F also reported ING's financial performance for 2007.   Among other things, it reported total annual income of $117.707 billion and net annual profit of $14.202 billion.

142.   On April 1, 2008, a *Global Finance* article entitled "World's Best Developed Markets Banks 2008" released the following statement about ING:

> "ING's results showed a strong performance for the full-year 2007 despite a challenging environment.    In the fourth quarter underlying net profit increased by 23.9%, supported by gains on equities-a stronger rate of growth than the full-year figure of 19.4%.   During 2007 it acquired new platforms for growth in developing markets, such as Oyak Bank in Turkey, and expanded its pension franchise in Latin America.   It also embarked on initiatives to improve efficiency, including the transformation of its retail banking businesses in the Benelux-a market that will be hotly contested by Fortis.
>
> ***The bank has suffered from the credit and liquidity crisis***.   In the fourth quarter ING reported a euro194 million loss on subprime and other related markets and a euro751 million negative revaluation on subprime, collateralized debt obligations and other assets.   ***But its capital position remains strong, with ratios well within targets:   Its Tier-1 capital ratio was 9.9% under Basel II at the beginning of January 2008***."

(Emphasis added).

143.   On April 2, 2008, Defendant Tilmant gave a presentation to analysts and investors (which included participants of the Plans) in Amsterdam at the ING Group Investor Relations Symposium.   His presentation was entitled "Focused for Growth" and stated that: (a) ING was well positioned to capitalize on changes in its industry; (b) ING was one of the most well-

capitalized and well-funded financial institutions in the world; and (c) ING was well positioned for both short-term and long-term growth in revenues and profits as of its focus on banking, investments, life insurance, and retirement services.

144.   On that same day, ING's CFO, Defendant Hele, gave a presentation to analysts and investors (which included participants of the Plans) in Amsterdam at the ING Group Investor Relations Symposium.   His presentation was entitled "Measuring Performance" and stated that ING was developing four Key Performance Indicators ("KPIs") to better track its results.   ING disclosed statistics for the KPIs for 2006 and 2007 at the symposium and stated that KPIs would be presented on a quarterly basis in the analyst presentation beginning in First Quarter 2008. The fourth KPI highlighted was Required Capital, and Defendant Hele represented that ING was in good condition with respect to Required Capital, which overall had declined by 6% from Fiscal Year 2006 to Fiscal Year 2007.

145.   The Company's Form 6-K ING filed with the SEC on May 15, 2008 was incorporated by reference into the Plans documents and reported the Company's condensed consolidated interim accounts for the three month period ended March 31, 2008.   It reported, *inter alia*, total income of €19.998 billion and net profit (before minority interests) of €1.564 billion.   This fiduciary communication reaffirmed the representation that ING's conservative risk averse policies caused it to be well-insulated from the worst effects of the market turmoil by stating:

> Risk Management
>
> ***ING continued to weather the credit and liquidity crisis well, with limited losses on distressed asset classes***.   Impairments, fair value changes and trading losses through the P&L totalled EUR 80 million before tax (EUR 55 million after tax) in the first quarter. Of that total, EUR 33 million before tax relates to US subprime RMBS, EUR 17 million to US Alt-A RMBS, EUR 16 million to

> CDOs/CLOs, EUR 4 million to monoline insurers and EUR 10
> million to investments in SIVs and ABCP.

(Emphasis added).

146.    On or about June 12, 2008, the Company filed a prospectus for a June 2008

offering, which formed part of the Registration Statement (the "June 2008 Prospectus"), issuing

$1,750,000,000 aggregate principal amount of 8.50% ING Perpetual Hybrid Capital Securities.

As of March 31, 2008, the June 2008 Prospectus reported ING shareholder equity of €539

million.

147.    The June 2008 Prospectus also stated in relevant part:

> We have filed a registration statement on Form F-3 under the
> Securities Act of 1933, as amended, with the SEC covering the
> Securities.  For further information on the Securities, you should
> review our registration statement and its exhibits.
>
> * * *
>
> We incorporate by reference the documents listed below, which we
> filed with or furnished to the SEC:
>
> * * *
>
> •    Our Current Report on Form 6-K filed on May 15, 2008
>      (our consolidated condensed interim accounts for the three-
>      month period ended March 31, 2008); [and]
>
> * * *
>
> •    Our Annual Report on Form 20-F for the year ended
>      December 31, 2007, filed on March 19, 2008.

148.    On June 17, 2008, ING sold at least 80 million 8.50% Securities ("2008

Securities") to the public at $25.00 per share pursuant to the June 2008 Prospectus.  The

Company's stock closed at $35.56 on the NYSE that day.

149.    The June 2008 Prospectus contained inaccurate statements or omitted to state

facts necessary to make the statements made therein not misleading, and were not prepared in

accordance with applicable SEC rules and regulations.

150.    The true facts which were omitted from the Registration Statement were:

- Defendants' assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

- Defendants failed to properly record losses for impaired assets;

- The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; and

- ING was not as well capitalized as represented, and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the Dutch government.

151.    On August 14, 2008, the Company filed a Form 6-K with the SEC.  This fiduciary communication once again reaffirmed the previous representation that ING's conservative risk averse policies caused it to be well-insulated from the worst effects of the market turmoil by stating:  "The direct P&L impact from the ongoing credit and liquidity crisis remained limited with a pretax loss of EUR 60 million (EUR 44 million after tax)."  The Form 6-K quoted Defendant Tilmant as stating: "ING continues to weather the turmoil in credit markets well, as writedowns on pressurised assets remained limited in the second quarter . . . .  We took advantage of the brief market rally in April to reduce our equity exposure."

152.    By September 19, 2008, the Company's stock had started to decline and closed at $30 on the NYSE.   The Company continued to take steps to assure the market that it was well capitalized and well positioned to withstand the market turmoil affecting other financial companies.   That same day, Defendant Hele made a presentation to investors and analysts in Madrid, Spain at "ING Investor Day."  Defendant Hele's presentation was entitled "ING Is Managing Through the Current Market Turmoil."  In his presentation, Defendant Hele made the following inaccurate statements:

ING is carefully managing through the current market turmoil;

ING has prudent capital management, including the fact that ING targets a AA rating on its investments and maintains spare leverage on its own balance sheet;

ING has carefully selected its investments after a thorough credit analysis;

ING has a diversified investment portfolio; [and]

ING is carefully managing its risk exposure in the current economic environment, including:

> Carefully managing its counterparty risks;
>
> Maintaining a diversified, well-collateralized retail loan book; [and]
>
> ING is taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy.

153.    At the September 19, 2008 ING Investor Day in Madrid, Spain, Defendant Hele specifically represented that ING was not only "more than adequately capitalized," but that ING had *spare leverage of €3.9 billion and that all of the spare leverage was "already on ING's balance sheet."*

154.    At that same Investor Day conference in Madrid, Defendant Hele specifically stressed the fact that ING's capital management tools allowed ING to handle any capital needs that might arise in the future without resorting to outside sources of capital.  As to the internal sources that Defendant Hele specifically emphasized were capable of ensuring adequate capital, he mentioned (a) ING's strong earnings; (b) the ability to engage in acquisitions and/or divestitures; (c) the risk reduction measures being undertaken at ING; and (d) the fact that ING's capital was fungible and could be moved around internally between ING's insurance, banking, and other operations in order to maintain required key capital ratios.  Defendant Hele also stressed the fact that ING and ING Insurance currently hold significant cash, which is available for injection into the banking, insurance, and subsidiary operations, which "would effectively

43

increase the D/E-ratios to the current limits." He also stressed the fact that ING's debt to equity

ratio could be increased up to 15% in order to increase any capital required in the future.

155.    These comments lead investors, including participants of the Plans, to believe that

ING stock was a prudent investment due to Defendant Hele's assurances that ING was

adequately capitalized and well-positioned to withstand the market turmoil affecting other

financial companies, and that ING did not suffer the significant problems affecting these other

companies, including the need to raise significant amounts of new capital.

156.    Less than one month after Defendant Hele made these comments, on October 17,

2008, ING issued a press release entitled "ING's capital position in line with targets despite

market turmoil in third quarter," which stated in part:

> Turmoil in financial markets and declining asset prices inevitably
> impacted ING's results in the third quarter, with impairments on
> equity and bond investments, pressurised asset classes, losses
> attributable to financial counterparties and fair value changes on
> real estate totalling approximately EUR 1.6 billion before tax.
> Loan loss provisioning at the bank also increased to approximately
> EUR 400 million. That is expected to result in a net loss of
> approximately EUR 500 million in the third quarter, based on
> preliminary numbers.
>
> . . . ING's Alt-A, subprime and CDO investments of approximately
> EUR 1.5 billion after tax were reflected in shareholders' equity in
> the third quarter, bringing total shareholders' equity to EUR 23.9
> billion at the end of September.

157.    On this news, the price of the Company's common stock declined by 27.6%,

closing at $10.65 after reaching an intra-day low of $9.89. ING Stock had closed the day before

at $14.70.

158.    On October 19, 2008, ING issued a press release entitled "ING to strengthen core

capital by EUR 10 billion," which stated in relevant part:

> ING announced today that it has reached an agreement with the
> Dutch government to strengthen its capital position, creating a

> strong buffer to navigate the current market and economic
> environment. ING will issue non-voting core Tier-1 securities for a
> total consideration of EUR 10 billion to the Dutch State.

> \* \* \*

> ING Group will use the proceeds of the transaction to increase
> shareholders' equity in ING Bank by EUR 5 billion and to
> strengthen the balance sheet of ING Insurance by EUR 2 billion.
> The remaining EUR 3 billion will be used to reduce the
> Debt/Equity ratio at ING Group from 15% to around 10%. After
> this transaction, ING Bank's core Tier-1 ratio will be around 8%,
> with ING Bank's Tier-1 ratio above 10%.

159.    On October 20, 2008, ING issued a memo from "ING Senior Management" to investors (including participants of the Plans) entitled "ING Strengthens Core Capital: Retirement savings and insurance customers continue to benefit from ING's strengthened financial position."  In the memorandum, ING's senior management stated that:

> "In today's often confusing and turbulent economic environment,
> we understand that it's more important than ever for you to feel
> comfortable about the company that manages your investment.

> "That's one of the reasons why ING has chosen to take part in a
> program offered by the Dutch government to further strengthen our
> capital position – our "buffer" against unexpected economic events
> – by €10 billion.

> "***Our position in terms of capital is strong.***  In fact, our capital
> ratios, which are a key measure of the strength of our company,
> exceed the requirements set by regulators.

> ". . . We are making this move to give our stakeholders and
> customers the most confidence and protection we can.  It means
> your retirement savings or insurance products continue to benefit
> from ING's strengthened financial position."

160.    Also in October 2008, in response to ING's reported €500 million loss, and €10 billion infusion of capital from the Dutch government, ING disseminated a brochure entitled "Answers to Questions You May Have" to the Plans' participants.  The brochure stated in relevant part:

**Answers to Questions You Might Have**

**What does the Dutch government investment/participation in ING mean for me?**

This is good news.  You will be dealing with an even stronger financial services organization backed by the government of one of the world's leading economic powers.  But what is important to realize is that ING has always had a strong capital position in line with targeted levels in the context of our third-party ratings.  With the measures taken yesterday, ING remains consistent with its prudent and conservative approach to have sufficient financial buffers.  For you, it means your ING-affiliated company remains strong.

**Is this investment by the Dutch government connected to the financial performance of ING and its ratings?**

No.  ING is confident about the strength of its financial position.  Its ratings currently remain strong.  After this capital reinforcement we think our position is even stronger.

**Are you in the same situation as Fortis, which was nationalized a few weeks ago, or other competitors?**

You cannot compare our situation to that of other companies – every company is different.  We cannot speak for others, but ING has always had a strong position and has continued meeting all its capital requirements.  We did not enter into this agreement to repair a gap in our balance sheet.

**How about the €500 million loss you reported?  Will you go bankrupt?**

On Friday, October 17, ING reported a preliminary third quarter loss of EUR 500 million.  Final third quarter financials will be released on November 12.  Given ING's prudent and conservative approach towards risks, this is the first time since the crisis began mid-last year that ING has reported a loss.  The reported losses and fluctuation in our share price do not affect the safety of your deposits nor impact the claims paying ability of contracts.

**What caused the drop in your profits in the third quarter?**

Operational performance of the business was solid, given the challenging market environment.

**And isn't ING one of the world's strongest and most prudent banks?**

We are.  ING is simply adapting to extraordinary market circumstances where even healthy banks need to take measures to reinforce their position.  ING is confident in its financial situation and wants to maintain its high standards as a prudent and conservative financial services institution.  We remain very well-

funded – we are one of the world's largest financial services institutions – and we have strong credit ratings.  We have solid risk management processes, which have helped us weather the current financial turmoil and we are well-diversified as both an insurer and bank.

**Why is the ING stock down?**

All financial stocks are getting badly hit by this unusual and unstable market environment.  ING is no different.  The fluctuation in ING's stock price does not affect the safety of your ING products (including:  deposits, mutual fund operations or the claims-paying ability of annuities and insurance policies).

**Is this transaction related to the drop in the stock price last Friday?**

No – the drop in our share price was of course very unfortunate for our shareholders – but did not trigger our decision to look at options to strengthen our capital position.

**Will the government provide extra capital if you need it?**

We believe this transaction gives ING ample capital to continue to build our franchise in the long term interests of all stakeholders.

**Are my retirement plan investments affected?**

No.  The holdings in your plan accounts are protected from creditors of ING.  The nature of those protections differs depending on the structure of the investment arrangement.  Of course, account values will fluctuate with market conditions and are subject to change.

161.    On October 23, 2008, ING announced that Defendant Hele, who made the statements on September 19, 2008 that ING had no need for any capital infusion, was stepping down effective March 31, 2009.

162.    In response to this disclosure, the Company's Stock continued to deteriorate.  By October 23, 2008, ING Stock reached an intra-day low of $6.57 and closed at $7.81.

163.    On November 13, 2008, the Company filed a Form 6-K with the SEC.  This fiduciary communication reported that the Company had sustained "its first ever quarterly loss, following €1.5 billion of impairments and losses" "on equities, pressurised assets and other debt securities."  Down-playing the significance of the loss, Defendant Tilmant stated in relevant part:

> In these increasingly turbulent times, ING acted proactively to reinforce its capital base after the Dutch government made funds available to help stabilise the financial system and create a level playing field.  The EUR 10 billion capital injection from the Dutch State helped to reassure our customers who entrust their savings and investments to ING.  In addition, the sale of our Taiwan life business will significantly reduce our exposure to long-term interest rates, reducing risks within the company.  ***Following these transactions, our capital position is stronger and we have capacity to absorb the impact of a further deterioration in financial markets***.

(Emphasis added).

164.    The foregoing statements were inaccurate because the Company's business model was not sound and it had not taken a prudent and disciplined approach in the interests of its shareholders (which included participants of the Plans).  In addition, the foregoing statements were inaccurate because there was no basis for the statement that the Company had the "capacity to absorb the impact of a further deterioration in financial markets" and because the €10 billion capital injection from the Dutch State was not a proactive measure as represented.  It was (as later disclosed) a "necessity" required to "reinforce" the Company's capital base.   Further, upon information and belief, the Company's November 13, 2008 Form 6-K was incorporated into the Plans Summary Plan Description ("SPD").

165.    On February 18, 2009, the Company disseminated a press release stating that it had suffered a "4Q underlying net loss of €3,101 million driven by market volatility and declining asset prices."   This press release quoted Defendant Hommen, Chairman of the Supervisory Board and CEO-designate, as stating:

> For ING, 2008 was marked by a sharp deterioration in financial results and the necessity to reinforce our capital base with the support of the Dutch State.  ING had started the year focused on growth, and we were overtaken by the pace and severity of the downturn in the fourth quarter that eroded our earnings and our equity.

We have subsequently taken measures to strengthen the company. We sought and received an Illiquid Assets Back-up Facility from the Dutch State on 80% of our portfolio of Alt-A mortgage-backed securities.  The sale of the Taiwan life business substantially reduced our economic capital requirements, and the sale of the Canadian non-life business will further reduce leverage in the insurance business.  As we enter what may be another tumultuous year our key capital ratios are within the new market norms, but we will remain vigilant in managing our capital and risks in the current environment.

Our top priorities this year are to further reduce asset exposures and rationalise the cost base.  We aim to shrink the balance sheet of ING Bank by 10% compared with the end of September, while continuing to lend to key customers in our home markets.  *And we are reallocating investments towards less risky assets.*  We are cutting our expenses this year by EUR 1 billion to align our cost base to the current operating environment.

The crisis has damaged confidence in the financial industry.  Our customers have continued to trust ING with their savings, and in this environment we realise that we must work to earn and retain that trust every day.  *Now more than ever it is necessary to go back to basics and do everything we can to strengthen our company and our commitment to our customers during these challenging times*.

Over the coming months, we will conduct a review of our portfolio of businesses to accelerate ING's transformation in light of the changes shaping our industry.  Our basic strategy, based on retail savings and investments, is a solid foundation for the future, but we must reduce the complexity of the Group by focusing on fewer businesses and markets.  We intend to emerge with a coherent portfolio of strong businesses with leading market positions. In order to truly drive operational excellence, we must simplify governance, reinforce accountability, and make the organisation more responsive to our customers' needs.

(Emphasis added).

166.    Discussing dividends, the February 18, 2009 press release also stated in relevant part:

As previously announced in October 2008, ING Group will not pay a final dividend in May 2009 over the year 2008.  Since ING Group already paid an interim dividend of EUR 0.74 in August 2008, ING is required under its agreement with the Dutch State to

pay the first short coupon on the core tier-1 securities in May 2009, pending approval from De Nederlandsche Bank (DNB).

Given the intensity of the crisis, it is difficult to foresee whether ING will be in a position to pay a dividend in 2009.  The interim dividend for 2009 will not automatically be half of the total dividend of 2008 now that dividends have been stopped.  ING will continue to pay dividends in relation to underlying cash earnings, and will take a balanced approach to dividends in a careful and conservative manner in the next few years. When a dividend is paid, the coupon on the core tier-1 securities is also payable, subject to DNB approval.

167.   The February 18, 2009 press release flatly contradicted the fiduciary communication that was disseminated to the participants of the Plans less than one year earlier. Rather than being "well-insulated from the worst effects of the market turmoil," the Company was so decimated by the market turmoil that it announced that "[g]iven the intensity of the crisis, it is difficult to foresee whether ING Group will be in a position to pay a dividend in 2009."

168.   On March 5, 2009, the Company's Stock closed at $3.03.  The Company's Stock is currently trading under $11 per share – a stunning 73% drop from where it closed on April 18, 2008 at $40.40.   The staggering loss has significantly reduced the overall value of the Plans' assets and participants' vested retirement benefits.

**B.**   **Defendants Regularly Communicated With The Plans' Participants Concerning Investment In ING Stock, Yet Failed To Disclose The Imprudence Of The Investment**

169.   Defendants regularly communicated with employees, including the Plans' participants, about ING's performance, future financial and business prospects, and ING Stock. During the Class Period, the Company fostered a positive attitude toward ING Stock as an investment for the Plans, and/or allowed the Plans' participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in ING Stock.  As such, the Plans' participants could not

appreciate the true risks presented by investments in ING Stock and therefore could not make informed decisions regarding investments in the Plans.

## C. Defendants Knew Or Should Have Known That ING Stock Was An Imprudent Investment For The Plans

170.   During the Class Period, Defendants knew or should have known that the Company's Stock was an imprudent investment for the Plans because: (a) the Company had not carefully managed itself through the current market turmoil; (b) the Company had not had prudent capital management; (c) the Company had not carefully selected its investments after a thorough credit analysis; (d) the Company had not diversified its investment portfolio; (e) the Company had not managed its risk exposure in the current economic environment, including but not limited to: (i) carefully managing its counterparty risks; (ii) maintaining a diversified, well-collateralized retail loan book; and (iii) taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy; (f) the fact that, as a consequence of the above, the Company's Stock price was artificially inflated; and (g) the fact that heavy investment of retirement savings in Company Stock would inevitably result in significant losses to the Plans and, consequently, to their participants.  Despite actual or constructive knowledge of these facts, Defendants did nothing to protect the heavy investment of the Plans participants' retirement savings in ING Stock.

171.   As a result of the enormous erosion of the value of ING Stock, the Plans' participants, who had a significant portion of their retirement savings invested in ING Stock, suffered unnecessary and unacceptable losses.

172.   Through their high ranking positions within the Company, Defendants knew or should have known of the existence of the above-mentioned problems.

173.    As a result of the facts known to Defendants, as described above, Defendants knew or should have know that investment in ING Stock was not a prudent investment, and that as a result investment of the Plans' assets in ING Stock would result in material and significant losses to the Plans. Yet Defendants failed to take any steps to protect the Plans and their participants from foreseeable losses.

174.    Defendants also knew or should have known that, as a result of the material omissions in the statements made by ING and its executives during the Class Period, the Plans' participants and beneficiaries could not properly assess the prudence of investing in ING Stock or otherwise take steps to protect their financial interests.

175.    As a result of Defendants' knowledge of and, at times, involvement in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in ING Stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in ING Stock.

176.    Defendants failed to conduct an appropriate investigation into whether ING Stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants and beneficiaries with information regarding the Company's problems so that participants could make informed decisions regarding whether to include ING Stock in the Plans.

177.    In addition, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.

178.    An adequate (or even cursory) investigation would have revealed to a reasonable fiduciary that investment by the Plans in ING Stock was clearly imprudent.  A prudent fiduciary

acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

179.    Because Defendants knew or should have known that ING Stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in ING Stock.

180.    Defendants had available to them several different options for satisfying this duty including, among other things: discontinuing further contributions to and/or investment in ING Stock under the Plans; divesting the Plans of ING Stock; making appropriate public disclosures as necessary; consulting with the DOL or independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of ING Stock.

181.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plans' investment in ING Stock.  In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company Stock even as the Company's problems came to light.

**D.      Defendants Suffered From Conflicts Of Interest**

182.    As ERISA fiduciaries, Defendants were required to manage the Plans' investments, including the investment in ING Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

183.    Conflicts of interest arise when a company that invests plan assets in company stock begins to deteriorate. As a company's financial health and prospects deteriorate, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear, "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992) (citation omitted).  Fiduciaries must avoid "placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

184.    The Company's SEC filings during the Class Period make clear that a significant percentage of the Company's officers' and directors' compensation is stock-based and in the form of cash.   ING's Form 20-F at http://www.sec.gov/Archives/edgar/data/1039765/000115697309000166/u06110e20vf.htm.

185.    For example, the short-term incentive plan ("STIP") is a key component of ING's performance-driven culture. The short-term incentive is paid in cash. The 'at target' bonus opportunity is expressed as a percentage of base salary.   The target levels are based on benchmarks reflecting external market competitiveness as well as internal objectives. Three financial parameters were used in the 2008 STIP for the members of the Executive Board and top senior management across the organization (the top-200 executives) to measure performance at Group level. These financial parameters are: (a) underlying net result per share; (b) underlying operating expenses; and (c) economic profit/embedded value profit (excluding financial variances).

186.    Further, the long-term incentive plan ("LTIP") at ING includes both stock options and performance shares.  LTIP awards are granted to ensure alignment of senior management with the interests of shareholders, and to retain top management over a longer period of time. The LTIP awards will be granted with a total 'fair value' split between stock options and performance shares.

187.    Certain Defendants' compensation was directly tied to the performance of the Company and the price of Company Stock.  Accordingly, certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance in order to increase their salaries and incentive compensation.

188.    Although some Defendants may have had no choice in tying their compensation to Company Stock (because compensation decisions were out of their hands), all Defendants had the choice of whether to keep the Plans' participants' and beneficiaries' retirement savings invested in Company Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

189.    Finally, any signal to the market that the Company was not a sound, long term investment, such as the Plans' divestiture of ING Stock, would have called into question Defendants' job performance as corporate officers.  Rather than have anyone question their soundness as leaders of ING, Defendants chose to remain silent and let the Plans continue to hold and acquire ING Stock.

190.    These conflicts of interest put Defendants in the position of having to choose between their own interests as directors, executives, and stockholders, and the interests of the Plans' participants and beneficiaries, for whom Defendants owed an undivided duty of loyalty.

191.    While the Defendants protected themselves, they stood idly by as the Plans lost tens of millions of dollars because of their investment in ING Stock.

**E.    Defendants' Actions/Inactions Concealed Their Fiduciary Breaches**

192.    Defendants' breaches of their ERISA-mandated fiduciary duties of prudence and loyalty, by their very nature, were self-concealing and could not be reasonably discovered through due diligence of the Plans' participants during the Class Period.   Further, certain of Defendants' alleged breaches, including breaches of their duties to speak truthfully and provide material information to the Plans' participants regarding the propriety of investing the Plans' assets in ING Stock during the Class Period, also actively served to conceal Defendants' primary breach of their duty of prudence.   Defendants' misleading, inaccurate and incomplete statements regarding the true financial health and prospects of the Company served to hide from the Plans' participants, *inter alia*: (a) the factual predicates underlying Plaintiffs' claims of the imprudence of investing in ING Stock during the Class Period and (b) the failure/absence of any investigation into the prudence of investing the Plans assets in ING Stock during the Class Period.   Therefore, Plaintiffs claims are timely brought under all applicable prongs of ERISA § 413 (1)-(2), 29 U.S.C. § 1113 (1)-(2).

## VIII.   THE RELEVANT LAW

193.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

194.    An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary.   *See* U.S.C. § 1002(21)(A); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995).

195.    When fiduciaries put the interests of the company or their own interests ahead of

the interests of plan participants, they violate ERISA.  A fiduciary may, therefore, be personally

liable to plan participants for breaching the responsibilities, obligations, or duties imposed under

the plan and must restore any losses to the plan with any profits the fiduciary made through use

of plan assets.  ERISA § 409(a), 29 U.S.C. § 1109(a).

196.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in

pertinent part:

> A fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries, for the
> exclusive purpose of providing benefits to participants and their
> beneficiaries, and with the care, skill, prudence, and diligence
> under the circumstances then prevailing that a prudent man acting
> in a like capacity and familiar with such matters would use in the
> conduct of an enterprise of a like character and with like aims.

197.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law."

*Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

198.    A fiduciary breaches the duty of loyalty when the fiduciary withholds information

that the fiduciary knows or should know a participant would need to make an informed decision.

Therefore, the duty of loyalty includes:  (a) a negative duty not to misinform; (b) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a

duty to convey complete and accurate information material to the circumstances of participants

and beneficiaries.

199.    A fiduciary must avoid conflicts of interest and resolve them promptly when they

do occur.  As such, a plan fiduciary must always administer a plan with an exclusive purpose or

"eye single" to the interests of the participants and beneficiaries, regardless of the interests of the

fiduciaries themselves or the plan sponsor.  *Bierwirth*, 680 F.2d at 271.

200.   A plan fiduciary is also responsible for the investment and monitoring of plan investments, ensuring that only prudent investments are offered as plan options, and monitoring such investments to ensure that they remain prudent and suitable for the plan. *In re ADC Telecomm, ERISA Litig.*, No. 03-2989, 2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004). This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan.

201.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)   if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

202.   Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of a fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given decision, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary did not

participate in a breach, if he knows of a breach, he must take steps to remedy it.

> [I]f a fiduciary knows that another fiduciary of the plan has
> committed a breach, and the first fiduciary knows that this is a
> breach, the first fiduciary must take reasonable steps under the
> circumstances to remedy the breach. . . . [T]he most appropriate
> steps in the circumstances may be to notify the plan sponsor of the
> breach, or to proceed to an appropriate Federal court for
> instructions, or bring the matter to the attention of the Secretary of
> Labor. The proper remedy is to be determined by the facts and
> circumstances of the particular case, and it may be affected by the
> relationship of the fiduciary to the plan and to the co-fiduciary, the
> duties and responsibilities of the fiduciary in question, and the
> nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

203.    Plaintiffs bring this action under the authority of ERISA § 502(a)(2) for relief

under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of

fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a), and

for other equitable and remedial relief.

## IX.    CAUSATION

204.    The Plans suffered tens of millions of dollars in losses because Defendants

imprudently invested the Plans' assets in ING Stock during the Class Period in breach of

Defendants' fiduciary duties.

205.    Had Defendants properly discharged their fiduciary and co-fiduciary duties,

including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated

duties of prudence and loyalty, eliminating ING Stock as an investment alternative when it

became imprudent, and divesting the Plans of ING Stock when maintaining such an investment

became imprudent, the Plans would have avoided some or all of the losses that it, and indirectly

the Plans' participants, suffered.

## X.      REMEDY FOR BREACHES OF FIDUCIARY DUTY

206.      Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been concentrated in ING Stock during the Class Period.

207.      As a consequence of Defendants' breaches, the Plans suffered significant losses.

208.      ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

209.      With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them.  The Court should adopt the measure of loss most advantageous to the Plans.  In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

210.      Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of:  (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2); (c) reasonable

attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs and interest on these amounts, as provided by law; and (e) such other legal or equitable relief as may be just and proper.

211.   Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## XI.   DEFENDANTS' INVESTMENT IN ING STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

212.   Some courts have applied a presumption of prudence to decisions by plan fiduciaries to invest plan assets in company stock in plans that qualify as Employee Stock Ownership Plans ("ESOPs") under the Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder.   The presumption is based on the ESOP's dual purpose of allowing employee stock ownership on the one hand and providing retirement savings on the other.   *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d Cir. 1995) (explaining dual purpose of ESOPs and adopting presumption of prudence to balance these concerns).   While Plaintiffs question the appropriateness of such an extension, some courts have extended the presumption to all eligible individual account plans, without regard to whether they are ESOPs.

213.   As these courts have made clear, when a presumption of prudence applies, "Plaintiffs may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

214.   If the fiduciaries know or if an adequate investigation would reveal that company stock is no longer a prudent investment for the purported ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.   *See Rankin v. Rots*, 278 F. Supp. 2d 853, 878 (E.D. Mich.

2003) ("A fiduciary is not required to blindly follow the Plan's terms").  Even where a governing plan document requires the investment of plan assets in company stock, such a requirement does "not *ipso facto* relieve [plan fiduciaries] of their fiduciary obligations." *Id.* at 870.

215.    Here, even if a portion of the ING Savings Plan is considered an ESOP, and a presumption of prudence is applied to the Defendants' decision to offer ING Stock as a plan investment option, the presumption is overcome by the facts alleged herein.  The alleged facts, which support the conclusion that ING Stock was an inappropriate and imprudent investment for the ING Savings Plan include, as detailed previously, the following:

- ING's assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

- ING had failed to properly record losses for impaired assets;

- The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets;

- ING was not as well capitalized as represented and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the Dutch government;

- a precipitous stock price decline during the Class Period - from nearly $46 per share in October of 2007 to just over $3 per share in March of 2009;

- the risk of further imminent collapse of the Company's stock price based on the Company's risky business practices;

- the Company's deteriorating financial condition as well as Defendants' conflicted status; and

- serious, if not gross, mismanagement evidenced by, among other things:

  o the Company had not carefully managed itself through the current market turmoil;
  o the Company did not have prudent capital management;
  o the Company had not carefully selected its investments after a thorough credit analysis;
  o the Company had not diversified its investment portfolio;

    o      the Company had not managed its risk exposure in the current economic environment, including, but not limited to:
- carefully managing its counterparty risks;
- maintaining a diversified, well-collateralized retail loan book; and
- taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy.

216.    In light of these circumstances, Plaintiffs overcome any applicable presumption of prudence regarding investment in ING Stock during the Class Period, to the extent that the presumption applies at all.

217.    The imprudence of continued investment by Defendants in ING Stock during the Class Period under the circumstances present here is recognized in DOL regulations:

> [B]ecause every investment necessarily causes a plan to forego other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. 2509.94-1.

218.    Defendants had available to them investment alternatives to ING Stock that had either a higher rate of return with risk commensurate to ING Stock or an expected rate of return commensurate to ING Stock but with less risk.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 547 (S.D. Tex. 2003).

219.    Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in ING Stock and, effectively, to do nothing to protect the Plans from significant losses as a result of such investment during the Class Period.

## COUNT I:

### Failure To Prudently And Loyally
### Manage The Plans And Assets Of The Plans

220.     Plaintiffs incorporate by reference the paragraphs above.

221.     This Count alleges fiduciary breach against the following Defendants: the Company, Executive Board Defendants, Supervisory Board Defendants, ING North America Defendants, Defendant ILIAC, Defendant ING U.S. Retirement Services, and the Committee Defendants (collectively, the "Prudence Defendants").

222.     As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

223.     As alleged above, the scope of the Prudence Defendants' fiduciary duties and responsibilities included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  Therefore, the Prudence Defendants were directly responsible for selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plans, and directing the Trustee regarding same.  The Prudence Defendants were also responsible for, among other things, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

224.     Contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans.  Specifically, during the Class Period, these Defendants knew or should have known that ING Stock was not a suitable and

appropriate investment for the Plans, but was, instead, a highly speculative and risky investment in light of the Company's fundamental weaknesses. Nonetheless, during the Class Period, these Defendants continued to offer ING Stock as an investment option for participant plan contributions. They did so despite evidence that (a) the Company had not carefully managed itself through the current market turmoil; (b) the Company had not had prudent capital management; (c) the Company had not carefully selected its investments after a thorough credit analysis; (d) the Company had not diversified its investment portfolio; (e) the Company had not managed its risk exposure in the current economic environment, including, but not limited to: (i) carefully managing its counterparty risks; (ii) maintaining a diversified, well-collateralized retail loan book; and (iii) taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy.

225.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to ING Stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In light of this, the Prudence Defendants were obliged to institute a regular, systematic procedure for evaluating the prudence of investment in ING Stock.

226.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in ING Stock, even though the Company's financial situation posed a great danger to the Plans. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to maintain investment in ING Stock under these circumstances.

227.   The Prudence Defendants' decisions regarding the Plans' investment in ING Stock described above, under the circumstances alleged herein, constituted an abuse of fiduciary discretion because a prudent fiduciary acting under similar circumstances would have made different investment decisions.   A prudent fiduciary would not have reasonably believed that continued investment of the Plans' contributions and assets in ING Stock was in keeping with the Plans settlors' expectations of how a prudent fiduciary would operate.

228.   The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

229.   According to DOL regulations and case law interpreting the statutory provision above, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

230.   According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

> (1)   a determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk

of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(2) consideration of the following factors as they relate to such portion of the portfolio:

(a) the composition of the portfolio with regard to diversification;

(b) the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(c) the projected return of the portfolio relative to the funding objectives of the plan.

231. Given the conduct of the Company as described above, the Prudence Defendants did not act prudently when they continued to invest the Plans' assets in ING Stock because, among other reasons, these Defendants knew of and failed to investigate that: (a) the Company's assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed; (b) the Company had failed to properly record losses for impaired assets; (c) the Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; (d) the Company was not as well capitalized as represented; (e) the Company had not carefully managed itself through the current market turmoil; (f) the Company had not had prudent capital management; (g) the Company had not carefully selected its investments after a thorough credit analysis; (h) the Company had not diversified its investment portfolio; and (i) the Company had not managed its risk exposure in the current economic environment, including, but not limited to: (i) carefully managing its counterparty risks; (ii) maintaining a diversified, well-collateralized retail loan book; and (iii) taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy.

232.    As such, the risk associated with the investment in ING Stock during the Class Period was far above the normal, acceptable risk associated with investment in Company Stock. The participants of the Plans were unaware of this risk and the Prudence Defendants knew or should have known as much.

233.    Given his inequity, the Prudence Defendants had a duty to avoid permitting the Plans or any participant to invest the Plans assets in ING Stock.

234.    Further, knowing the ING Stock Funds in the Plans was not a diversified portfolio but was heavily invested in Company Stock, these Defendants had a heightened responsibility to divest the Plans of Company Stock if it became or remained imprudent.

235.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve conflicts promptly when they occur.   A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. Certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance, because the better the Company's performance and, consequently, the higher the price of the Company's Stock, the larger certain Defendants' salaries and incentive compensation.  Fiduciaries laboring under such conflicts must, in order to comply with the duty of loyalty, make special efforts to assure that their decision-making process is untainted by the conflict and is made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

236.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by: (a) failing to engage independent advisors who could make independent judgments concerning the Plans' investment in ING Stock; (b) failing to notify

appropriate federal agencies, including the DOL, of the facts and circumstances that made ING Stock an unsuitable investment for the Plans; (c) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; (d) failing to disregard the impact of their duty to avoid conflicts of interest on their own compensation; and (e) placing their own and the Company's improper interests above the interests of the participants with respect to the Plans' investment in ING Stock.

237.   Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those who they direct or who are directed by the plan, to do so.

238.   The Prudence Defendants breached this duty by: (a) continuing to offer ING Stock as an investment option for participants of the Plans; (b) continuing to invest assets of the Plans in ING Stock rather than in cash or other short-term investment options; (c) failing to divest the Plans of imprudent ING Stock; and (d) engaging in this course of conduct when Defendants knew or should have known that ING Stock no longer was a prudent investment for participants' retirement savings.

239.   The Prudence Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information to the participants and beneficiaries of the Plans regarding (a) the Company's lack of prudent capital management; (b) the Company's lack of carefully selected investments; (c) the Company's lack of diversified investment portfolio; (d) the Company's risk exposure in the current economic environment, including, but not limited to:

(i) its counterparty risks; (ii) maintaining a diversified, well-collateralized retail loan book; and (iii) taking risk mitigating actions, including decreasing its exposure to equities, implementing hedges, and insisting on disciplined execution of its risk mitigation strategy; (e) the artificial inflation of ING Stock caused by these circumstances; and (f) the dire financial circumstances created by the Company's improper business practices.   During the Class Period, upon information and belief, the Company fostered a positive attitude toward the ING Stock among the participants and beneficiaries of the Plans and/or allowed the participants of the Plans to follow their natural bias towards investment in employer stock by not disclosing negative material information concerning investment in ING Stock.   As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's Stock and therefore could not make informed decisions regarding their investments in the Plans.

240.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses.   If these Defendants had discharged their fiduciary duties by prudently investing the Plans' assets, the losses suffered by the Plans would have been minimized or avoided altogether.

241.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost tens of millions of dollars of retirement savings.

242.    Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II:

### Breach of Fiduciary Duty to Provide Complete and
### Accurate Information to the Plans' Participants

243.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

244.    This Count alleges fiduciary breach against the Company, Executive Board Defendants, the Supervisory Board Defendants, and the Committee Defendants (the "Communication Defendants").

245.    The Communication Defendants owed Participants a fiduciary duty not to misinform or mislead them regarding the Plans or the Plans' investment options, but rather to speak truthfully and refrain from providing inaccurate material information.

246.    The Communication Defendants were required to disclose complete and accurate information regarding the Plans and the Plans' investment options such that participants can make informed decisions regarding how to exercise their rights and interests under the Plans. This included disseminating the Plans documents and information to participants regarding the Plans and assets of the Plans.  The Communication Defendants additionally owed the Plans participants a fiduciary duty to affirmatively provide participants with investment education and with any information they possessed that they knew or should have known would have a material impact on the Plans.

247.    These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the Communication Defendants, on the one hand, and the participants, on the other.  These duties applied to all of the Plans' investment options, including investment in ING Stock.

248.    The Communication Defendants breached these duties by failing to provide complete and accurate information regarding the Company and the prudence of ING Stock as an retirement savings option under the Plans, making inaccurate statements about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Company Stock and the prudence of ING Stock for retirement savings.  The Communication Defendants knew or should have known that information they possessed regarding the Company's operations, financial conditions, debt obligations, and access to financing would have an extreme impact on the Plans.  Yet, in violation of their fiduciary duties, the Communication Defendants failed to provide participants with this information that was crucial to accurately assess the quality of ING Stock as a retirement asset.

249.    The Communication Defendants permitted the issuance of a multitude of inaccurate statements regarding the value of ING Stock and the financial health of the Company.

250.    Because the Communication Defendants never disclosed adverse, material information to participants, at the time that participants made such investments, participants were without knowledge of the facts concerning the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in ING Stock.  Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in ING Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by participants, ING Stock was an inherently unsuitable and inappropriate retirement asset for their plan accounts.

251.    The Communication Defendants' inaccurate statements and omissions were material to the determination of Plaintiffs and the other members of the Class whether investing in or maintaining their investments in the ING Stock was prudent.  Thus, Plaintiffs and the Plans

participants relied to their detriment on the incomplete and inaccurate information provided by the Communication Defendants in their fiduciary communications.

252.    The Communication Defendants' breaches of fiduciary duty were particularly devastating to the Plans and their participants, as a significant percentage of the Plans' assets was invested in ING Stock during the Class Period.  The Plans, and indirectly Plaintiffs and the other Class members, lost tens of millions of dollars of retirement savings as a result of the stock's precipitous decline.  Had accurate information been provided, participants could have avoided these losses.

253.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), the Communication Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III:

## Failure To Monitor Fiduciaries

254.    Plaintiffs incorporate by reference the allegations above.

255.    This Count alleges fiduciary breach against the following Defendants: the Company, the Executive Board Defendants, the Supervisory Board Defendants, ING North America, and ILIAC (collectively, the "Monitoring Defendants").

256.    As alleged above, during the Class Period, the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

257.    The scope of the Monitoring Defendants' fiduciary responsibilities includes the responsibility to appoint and remove, and thus monitor the performance of other fiduciaries.  The

Monitoring Defendants exercise their plan administrator functions through the Committee Defendants with respect to the Plans. Thus, it has a duty to monitor the Committee Defendants.

258.    The Monitoring Defendants had oversight responsibility over the Plans and the Plans' compliance with ERISA and, as such, had oversight responsibility for the performance of the Committee.

259.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

260.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether their fiduciary appointees are properly performing their fiduciary responsibilities.  In the absence of a sensible process for monitoring appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

261.    Furthermore, a monitoring fiduciary must provide their fiduciary appointees with complete and accurate information that they know or reasonably should know that the fiduciary appointees must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

262.    On information and belief, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in ING Stock if not on a broader basis, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans

suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to ING Stock; (b) failing to ensure that their fiduciary appointees appreciated the true extent of ING's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in ING Stock; (c) failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate insofar as they continued to allow and maintain investments in ING Stock despite their knowledge of practices that rendered ING Stock an imprudent investment during the Class Period for participants' retirement savings in the Plans.

263.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided altogether.

264.   As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

265.   Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT IV:**

**Failure to Avoid Conflicts of Interest – Against All Defendants**

266.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

267.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

268.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

269.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in ING Stock.

270.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided altogether.

271.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered losses, and indirectly the Plans' participants, lost a significant portion of their retirement investments.

272.    Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT V:

### Co-Fiduciary Liability

273.    Plaintiffs incorporate by this reference the allegations above.

274.    This Count alleges co-fiduciary liability against all Defendants.

275.    As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

276.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  Defendants breached all three provisions.

277.    ***Knowledge of a Breach and Failure to Remedy***.  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Defendant knew of the breaches by the other fiduciaries and made no effort to remedy those breaches.

278.    ING, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices.  Thus, knowledge of such practices is imputed to ING as a matter of law.

279.   Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that Defendants were breaching their duties by continuing to maintain the Plans investments in Company Stock.  Yet they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the significance of ING's failed and inappropriate business practices and by obfuscating the risk that these practices posed to the Company, and, thus, to the Plans.

280.   ***Knowing Participation in a Breach***.  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act or omission is a breach.  ING, ING North America and ILIAC knowingly participated in the fiduciary breaches of Defendants who failed to prudently and loyally manage the Plans in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plans' participants.

281.   ***Enabling a Breach***.  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

282.   The Monitoring Defendants' failure to monitor the Committee Defendants enabled that Committee to breach its duties.

283.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars of retirement savings.

284.    Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), all Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and the Plans' participants;

B.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty to the extent allowable by law;

D.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in ING Stock;

E.    Actual damages in the amount of all losses the Plans suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all triable issues.

Dated: June 8, 2009

PAGE PERRY LLC

s/ David J. Worley

David J. Worley (Ga. Bar No. 776665)
James M. Evangelista (Ga. Bar No. 707807)
1040 Crown Pointe Parkway, Suite 1050
Atlanta, GA 30338
Tel: (770) 673-0047
Fax: (770) 673-0120
Email: dworley@pageperry.com
         jevangelista@pageperry.com

*Liaison Counsel for Plaintiffs*

JOHNSON BOTTINI, LLP
Frank J. Johnson
Francis A. Bottini, Jr.
655 West Broadway, Suite 1400
San Diego, CA 92101
Tel: (619) 230-0063
Fax: (619) 233-5535
Email: frankj@johnsonbottini.com
         frankb@johnsonbottini.com

*Interim Lead Counsel for Plaintiffs*

GAINEY & MCKENNA
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1 300
Fax: (212) 983-0383
Email: tjmckenna@gaineyandmckenna.com

*Counsel for Plaintiffs*